IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,     )
                              )
                Plaintiff,    )
                              )
        v.                    )      No. 3:08-CR-108
                              )      (PHILLIPS/SHIRLEY)
                              )
DONALD GLEN FLACK,            )
                              )
                Defendant.    )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.

§ 636(b) for disposition or report and recommendation regarding disposition by the District Court,

as may be appropriate. The Defendant is charged in a single count Indictment [Doc. 3], which

contends that he knowingly, intentionally, and without authority, conspired with others to commit

violations of 21 U.S.C. § 841(a)(1), that is, to distribute, and possess with intent to distribute, five

(5) kilograms or more of a mixture and substance containing a detectable amount of cocaine

hydrochloride and fifty (50) grams or more of a mixture and substance containing a detectable

amount of cocaine base, Schedule II controlled substances.

The Defendant has filed a Motion to Suppress Physical Evidence [Doc. 33], which argues

that physical evidence found during a search of his home should be suppressed because the search

warrant lacked probable cause, and a Motion to Suppress Statements [Doc. 35], which argues that

statements he made during and after the search were obtained in violation of various constitutional

rights. The Government responds that both the physical evidence and the Defendant's statements

were lawfully obtained. [Doc.43-44].

The parties appeared before the Court for a motion hearing on June 3, 2009. Assistant United States Attorney Tracy Stone was present representing the Government. Attorney Michael McGovern represented the Defendant, who was also present. The Court heard the evidence presented and the arguments of the parties on the motions. At the conclusion of the hearing and at the request of the parties, the Defendant was given until June 19, 2009, to file a supplemental memorandum, and the Government was given until June 29, 2009, to file a responsive supplemental memorandum. The Defendant filed his Supplemental Memorandums in Support of the Motion to Suppress [Docs. 51 and 52] on June 19, 2009 and June 22, 2009, and the Government filed its Responses to Defendant's Post-Hearing Supplemental Memorandum [Docs. 53 and 54] on June 23, 2009 and June 29, 2009.

I. **FACTS**

At the hearing, the Court heard from four witnesses. Their testimony is summarized as follows.

A. **Lieutenant David Henderson**

Lieutenant David Henderson ("Lt. Henderson") testified that he is employed by the Knox County Sheriff's Department ("KCSD") and serves as the lieutenant in charge of narcotics investigations. Lt. Henderson said he has served in this capacity for twelve to thirteen years.

1. *Testimony Regarding the Search Warrant[1]*

Lt. Henderson was presented with the affidavit underlying the search warrant that was issued in this case. He confirmed that it was the affidavit he swore out to obtain the warrant, and the

---

[1]In order to make examination and cross-examination on the two suppression motions more orderly, the parties requested that the Government's witnesses first testify on the search warrant issues and be cross-examined and then testify as to the statement issues and be cross-examined. The Court granted this request and has organized its recitation of the facts accordingly. The Defendant's witnesses' testimony was not divided.

affidavit was marked as **Exhibit 1**. Looking at page three of the affidavit, Lt. Henderson confirmed that the inclusion of the name "Germany Hines" in the last sentence of the first full paragraph on the page, was a typo, and no such person was related to the investigation of this case. Lt. Henderson stated that "Germany Hines" should have been "Mark Hartsell." Looking at the last sentence of the third full paragraph on the page, Lt. Henderson stated that he did not believe Agent Rich Calcagno ("Agent Calcagno") saw a hand-to-hand exchange between the referenced confidential informant ("CI") and Mark Hartsell ("Mr. Hartsell"). Lt. Henderson confirmed that Agent Calcagno and other officers searched the CI's car prior to the meeting with Mr. Hartsell and that after the meeting, the CI had cocaine in the car. Lt. Henderson confirmed that Agent Calcagno had circumstantial evidence of the buy and that a more accurate statement would have been that Agent Calcagno saw the CI get into Hartsell's car.

Lt. Henderson testified that Agent Calcagno was the main source of information for the affidavit. Lt. Henderson recalled that there were approximately ten officers conducting surveillance in the investigation and they were supervised by Agent Calcagno. Lt. Henderson stated that in preparing the affidavit he made his effort in good faith with no intention to mislead.

On cross examination, Lt. Henderson confirmed that Carlton Bryant ("Mr. Bryant") typed the affidavit. Lt. Henderson confirmed that officers gave the information they observed to Agent Calcagno, then Agent Calcagno relayed the information to Lt. Henderson, and then Lt. Henderson relayed the information to Mr. Bryant. Lt. Henderson explained that he was in Mr. Bryant's office as the affidavit was being composed, and he was on the phone with Agent Calcagno. Lt. Henderson said that Agent Calcagno would give him the information, and he would verbalize it to Mr. Bryant, who was preparing the affidavit. Lt. Henderson said that he looked over the affidavit after it was

3

prepared.

As to the first mistake in the warrant, Lt. Henderson testified that he did not know how "Germany Hines" was mistakenly inserted in the warrant. He said he assumed that Mr. Bryant took a previous search warrant and changed things around but forgot to take that sentence out.

As to the second mistake, Lt. Henderson confirmed that he was not on the scene on September 24, 2007, when the CI met Mr. Hartsell at Wendy's, a fast-food restaurant. Lt. Henderson said that Agent Calcagno did not tell him that he saw a hand-to-hand purchase, but Lt. Henderson confirmed that he must have told Mr. Bryant that information for it to be in the warrant. Lt. Henderson said that if the information was false, it was his fault. Lt. Henderson said he did not know of any other errors in the affidavit, and he said he did not know whether the language of the sentence appeared in a previous search warrant that Mr. Bryant had worked off of. Lt. Henderson confirmed that he was not at the scene and did not know whether Mr. Hartsell got into the CI's car or the CI got into Mr. Hartsell's car.

Lt. Henderson confirmed that he had read the affidavit before, but he did not catch the error. Lt. Henderson said the last time he reviewed his statement was the morning of the hearing and that at that time he did not find any other errors. Lt. Henderson said he checked the addresses used in the affidavit but stated that the information from September 21, 2007, about houses was from Agent Calcagno because Lt. Henderson was not at the house. Lt. Henderson confirmed that Agent Calcagno gave him the addresses that were used in the third paragraph on the second page of the warrant. Lt. Henderson did not recall Agent Calcagno saying if 4329 and 4333 Apex Drive were adjoined by a driveway.

4

*2.*     *Testimony Regarding the Defendant's Statements to Officers*

Lt. Henderson stated that the search warrant for the Defendant's home was executed on the night of September 24, 2007. However, Lt. Henderson agreed that it may have been executed after midnight and would have, technically, been executed on the morning of September 25, 2007. Regardless of the exact hour, Lt. Henderson confirmed that the search warrant was executed at night. Lt. Henderson said he was not in the front of the entry line. Lt. Henderson could not recall who knocked and announced the officers' entry, but he believed it was Adam Mitchell who had the battering ram and likely made the announcement. Lt. Henderson recalled approximately ten officers entering the home to execute the warrant, and it was his belief, that the battering ram was used to gain entry into the home. Lt. Henderson did not recall being the first to enter the residence; instead he testified that he entered the home within about a minute of the first officers.

Lt. Henderson testified that upon entering the home he saw a couple of children and a "black lady." Lt. Henderson stated that the woman was seated on a couch in the direction of the living room. Lt. Henderson believed that the children were in a bedroom, which was straight ahead from the entry way. Lt. Henderson believed officers were in the bedroom with the children. Lt. Henderson said that, to his knowledge, the children were never handcuffed. Lt. Henderson stated that he never saw them handcuffed and stated, more generally, that officers do not handcuff nine-year-old children. However, he confirmed that the woman was handcuffed. Lt. Henderson stated that, after officers found out she was pregnant, they handcuffed her in front instead of behind her back. Lt. Henderson stated that officers probably removed the handcuffs after the location was secure to let her deal with the children.

5

Lt. Henderson stated that the Defendant was in the back bedroom when officers entered. Lt. Henderson said he did not speak to the Defendant until he was brought onto the porch of the house. Lt. Henderson confirmed that he told the Defendant that Judge Leibowitz, the judge who issued the search warrant, said "hello." Lt. Henderson stated that Judge Leibowitz instructed him to say "hello" to the Defendant, so he did. However, Lt. Henderson denied making any comment about "everyone going to jail," if the Defendant did not cooperate. Lt. Henderson recalled the Defendant stating that his girlfriend, who also lived in the home, had nothing to do with the alleged crimes.

Lt. Henderson stated that when executing a search warrant officers ask where the items being searched for might be hidden to give suspects the opportunity to cooperate. Lt. Henderson denied that officers asked where the drugs were to prevent in-depth searching. He explained that, regardless of the information a suspect supplies, officers will search the area also in case the suspect only revealed where part of the items to be searched for could be found. Lt. Henderson confirmed that he asked the Defendant where the drugs were,[2] and Lt. Henderson said that at the time he asked, the Defendant had not been informed of his <u>Miranda</u> rights. Lt. Henderson stated that the Defendant was in custody at the time and was being detained.

Lt. Henderson said that he was not present when Agent Calcagno arrived. Lt. Henderson explained that Agent Calcagno went into the home's basement to speak to the Defendant. Lt. Henderson did not recall the Defendant being left in the basement while Agent Calcagno went upstairs. Lt. Henderson did not remember Agent Calcagno saying that the Defendant ever asked for an attorney. Lt. Henderson confirmed that the Defendant was cooperative and that a substantial amount of cocaine was eventually recovered, although he did not say when or where. Lt. Henderson

---

[2]Lt. Henderson did not state how the Defendant responded to this question.

6

also stated that the Defendant took officers to another house that was involved in alleged criminal activity.

Lt. Henderson then testified regarding events that occurred after the date of the search and confirmed a number of meetings that he, Agent Calcagno, and other officers had with the Defendant. Lt. Henderson recalled that there were meetings at the Defendant's house and at the High Intensity Drug Trafficking Areas ("HIDTA") program office. Lt. Henderson stated that he was not involved in all of the meetings with the Defendant, but he testified that they were all consensual. Lt. Henderson confirmed that some of the meetings were held at law enforcement offices. Lt. Henderson testified that the Defendant came on his own accord and was not handcuffed. Lt. Henderson said he went to the Defendant's house once or twice, but he denied that handcuffs were used during these visits. Lt. Henderson stated that the purpose of the visits to the house was to check on the Defendant because the Defendant had been out of touch with Agent Calcagno. Lt. Henderson testified that the Defendant was not advised of his <u>Miranda</u> rights during these meetings. Lt. Henderson confirmed that officers sought, and were given, judicial approval to allow the Defendant to cooperate in their investigation.

On cross examination, Lt. Henderson stated that on the evening of the search, there were, at least, two children present when he entered the home and confirmed that there was a boy and a girl. Lt. Henderson said he did not recall how big the nine year old boy was, nor did he recall seeing either child in handcuffs. Lt. Henderson said he saw the boy as soon as he entered the home. Lt. Henderson did not remember how big the girl was.

Lt. Henderson stated that the Defendant's home was between Sutherland Avenue and Hollywood Road and slightly west of West High School. Lt. Henderson stated that the HIDTA

7

office was off of Middlebrook Pike. Lt. Henderson denied ever transferring the Defendant to the HIDTA office, but he estimated that the office was five to ten miles from the Defendant's home.

Lt. Henderson confirmed that on September 25, 2007, officers did not have probable cause to arrest either the woman or the children that were at the Defendant's home. In regards to Judge Leibowitz, Lt. Henderson explained that the Defendant had appeared in front of her and that she recognized the name in the search warrant when she reviewed it. Lt. Henderson denied that Judge Leibowitz indicated any other knowledge of the Defendant, but he admitted that he did not ask. Lt. Henderson said he did not give Judge Leibowitz a photograph of the Defendant with the search warrant, but he confirmed that he did give her some attachments to the warrant. Lt. Henderson could not remember where the affidavit was executed and the search warrant issued, but he did note that he only meets Judge Leibowitz at two places to get search warrants, either a church near her house or her office. He stated that the issuance had to have taken place at one of those two locations.

Turning back to the execution of the search warrant, Lt. Henderson stated that he did not advise the Defendant of his Miranda rights, though he admitted there was no question the Defendant was detained. Lt. Henderson said he did not witness Agent Calcagno or other officers advise the Defendant of his Miranda rights, but Lt. Henderson said that Agent Calcagno told him that he advised the Defendant of these rights. Lt. Henderson confirmed that both he and Agent Calcagno spoke to the Defendant and, thereafter, the Defendant and the officers traveled to another location. Lt. Henderson noted that the whole group went to the other location but he could not recall if the Defendant rode in his vehicle or another officer's vehicle. Lt. Henderson testified that the Defendant was not taken into custody afterward and that officers left with the understanding that the Defendant would cooperate in future meetings.

8

Lt. Henderson could not recall where the later meetings with the Defendant took place. Lt. Henderson noted that Agent Calcagno may have completed 302 forms[3] with the locations, but Lt. Henderson said he did not make any reports. Lt. Henderson again confirmed that he went to the Defendant's house after the Defendant failed to answer officers' calls. Lt. Henderson believed this visit was in early April of 2008. Lt. Henderson said he was only positive that the one trip to the residence occurred, but he admitted that there may have been other trips, which he did not recall. Lt. Henderson said he was not positive about the HIDTA office trips and was only one-hundred percent sure that he participated in the April 2008 visit to the Defendant's residence.

Lt. Henderson explained that officers were not required to get judicial approval to have conversations with the Defendant, but he confirmed that they were required to get approval for a defendant to actively cooperate in an investigation. Lt. Henderson confirmed that officers received the approval of Judge Kenneth Irvine, a Knox County Criminal Court Judge. Lt. Henderson stated that if there were documentation of this approval the FBI would have it.

## B.    FBI Special Agent Rich Calcagno

FBI Special Agent Rich Calcagno ("Agent Calcagno") testified that he primarily investigates drug-related crimes, as part of the HIDTA task force, and has been doing so for approximately six years.

### 1.    *Testimony Regarding the Search Warrant*

Agent Calcagno recognized the affidavit that was previously marked as Exhibit 1. He stated that "Germany Hines" was an individual involved in an independent, previous investigation, and

---

[3]FD-302 forms are used by FBI agents to report and summarize the interviews they conduct. Throughout the hearing, counsel and witnesses referred to these documents, informally, as "302 forms."

should not have appeared on page three of the affidavit. Agent Calcagno described his role in the preparation of the affidavit as participating in the surveillance and then providing Lt. Henderson with the information that had been gathered. Agent Calcagno denied directly preparing the affidavit and stated that he only gave information to Lt. Henderson.

Looking at page three of the affidavit, Agent Calcagno testified that he did not tell Lt. Henderson that he saw a hand-to-hand transaction between the CI and Mr. Hartsell. However, Agent Calcagno confirmed that he did tell Lt. Henderson about the drug transactions that he had observed. Agent Calcagno said that he told Lt. Henderson the following: he observed Mr. Hartsell's vehicle drive to the Wendy's restaurant and saw the CI get into the vehicle; the CI thereafter met officers at a prearranged meeting spot; and officers found cocaine on the CI at that time along with a recording device. Agent Calcagno also noted that Agent Robert Burnett ("Agent Burnett"), because of the vantage point of his vehicle and his better eyesight, could see Mr. Hartsell in the vehicle. However, Agent Calcagno confirmed that Agent Burnett did not see a hand-to-hand transaction.

As to the addresses in the affidavit, Agent Calcagno testified that 4333 Apex Drive is the lot adjacent to 4329 Apex Drive and was the only observable address during the surveillance because officers could not see the "4329" on the Defendant's home. Agent Calcagno stated that he radioed that the house adjacent to 4333 Apex Drive was the target. Agent Calcagno was presented with four photographs taken on Apex Drive, which were marked as **Collective Exhibit 2**. In Exhibit 2-1, Agent Calcagno identified the house on the left side of the photograph as 4329 Apex Drive and the house on the right side of the photograph as 4319 Apex Drive. Looking at Exhibit 2-2, Agent Calcagno stated that the brick house on the left side of the photograph was 4333 Apex Drive, the house which had the mailbox that was used as a reference. Agent Calcagno identified Exhibit 2-3,

10

as a close-up photograph of the mailbox that was used as a reference. Finally, Agent Calcagno stated that the shared driveway is between the Defendant's home at 4329 Apex Drive and 4319 Apex Drive; he stated that 4329 Apex Drive and 4333 Apex Drive do not share a driveway.

On cross examination, Agent Calcagno stated that he took the photographs marked as Exhibit 2 within the last month or two, and he confirmed that they were not relied upon in the issuance of the search warrant. Agent Calcagno stated that there were other photographs that were attached to the search warrant. Agent Calcagno said that the photographs marked as Exhibit 2 were accurate, other than any foilage changes between a picture taken in September and one taken in April. Agent Calcagno said that he took the recent photographs to help the Assistant United States Attorney assigned to the case understand the layout of the houses. Agent Calcagno stated that he did not take the photographs that were attached to the search warrant.

Thereafter the Government presented the attachments to the search warrant. Three photographs that were attached to the search warrant were marked as **Collective Exhibit 3**. Two Knoxville Utilities Board maps that were attached to the search warrant were marked as **Collective Exhibit 4**.

Agent Calcagno confirmed again that he was a member of the surveillance team on this investigation. Agent Calcagno explained that on September 21, 2007, he was initially at a meeting with the CI and he then followed the CI to the Sutherland Avenue area based upon Mr. Hartsell's directions to the CI. Agent Calcagno confirmed that the CI had a functioning, recording device on him, but he was not sure whether the recordings from the device had been given to the Government. Agent Calcagno stated that he later followed Mr. Hartsell and the CI to Apex Drive. Agent Calcagno said he observed the driveway, but he said that because it was dark he only saw the back lights of

11

the vehicle. Agent Calcagno said he later relayed this information to Lt. Henderson. Agent Calcagno noted that there was "a lot going on," but he believed that he relayed all of the information.

Looking at Exhibit 4-1, Agent Calcagno confirmed that 4329 Apex Drive is the Defendant's home. He agreed that the squiggly line drawn by Attorney McGovern represented the driveway for the Defendant's residence. Agent Calcagno confirmed that there is no driveway between 4333 Apex Drive and 4329 Apex Drive. Agent Calcagno made a horizontal line on Exhibit 4-1 to indicate the area where Mr. Hartsell's vehicle stopped in the shared driveway. Agent Calcagno stated that, as he recalled, he was to the east of the Defendant's residence when he observed the vehicle. Agent Calcagno stated that he next observed Mr. Hartsell's vehicle as it came onto Apex Drive. Agent Calcagno stated that another officer on surveillance, Paul Curtis, observed the vehicle, although Agent Calcagno could not recall where he was positioned.

Looking at page two of the affidavit, Agent Calcagno testified that he had no reason to believe that Mr. Hartsell went into 4333 Apex Drive. Agent Calcagno did not know why the affidavit cited 4333 Apex Drive as a possible destination for Mark Hartsell. He surmised that 4333 Apex Drive was incorrectly substituted in the affidavit because it was radioed out as the only observable address.

Looking at Exhibit 3-A, Agent Calcagno stated that the house in the photograph appeared to be 4329 Apex Drive, but he noted that the photograph was very grainy. After comparing Exhibit 3-A to Exhibit 2-1, Agent Calcagno confirmed that Exhibit 3-A was a photograph of 4329 Apex Drive. Agent Calcagno confirmed that neither Exhibit 3-A nor Exhibit 3-B show the house to the east. Agent Calcagno had difficulty making out the house in Exhibit 3-C, but he stated that it did not show a house to the east either. Agent Calcagno said he would need to read the affidavit to

determine whether the affidavit referenced the Defendant's shared driveway.

Agent Calcagno recalled that on September 21, 2007, Mr. Hartsell was driving a black 300 Chrysler, which he thought had tinted windows. Agent Calcagno stated that on September 24, 2007, Mr. Hartsell was driving a black Ford Explorer, which he thought had some tinting on its windows.

2. *Testimony Regarding the Defendant's Statements to Officers*

Agent Calcagno testified that when the execution of the search warrant at the Defendant's residence began, he and another officer, Paul Curtis, went to the left side of the house in the yard to ensure that no one evaded officers by running out the back. Agent Calcagno stated that after the house was secured he went inside; he estimated that no more than five minutes passed between the other officers' entry and his entry into the house. Agent Calcagno said that upon entry he observed the Defendant, his girlfriend, and at least one small child, which he recalled was a female. Agent Calcagno stated that the girl was not handcuffed, and he said that he did not observe any children in handcuffs. Agent Calcagno said he did not know that the Defendant's girlfriend was pregnant at the time. Agent Calcagno confirmed that he took the Defendant to the basement to interview him, but before they went to the basement, he walked through the house. Agent Calcagno did not remember where he first saw the Defendant, and he did not remember whether he was nearby when Lt. Henderson spoke to the Defendant. Agent Calcagno did not remember hearing any threat that "Everybody is going to jail."

Agent Calcagno said that his talk with the Defendant in the basement took place within an hour of the initial entry. Agent Calcagno noted that another officer Agent Burnett was present during the entire talk in the basement and Mr. Bryant, an attorney with the KCSD, was in and out of the basement. Agent Calcagno confirmed that he informed the Defendant of his <u>Miranda</u> rights and that

13

Agent Burnett was present. Agent Calcagno stated that the Defendant understood his rights, and Agent Calcagno stated that he thenquestioned the Defendant. Agent Calcagno said the Defendant never requested an attorney. Agent Calcagno did not recall whether he stopped the questioning at any time. However, he stated that there may have been times when he went upstairs to relay the locations in the home where the Defendant said drugs could be found.

Agent Calcagno next addressed the events that took place after September 25, 2007. Agent Calcagno confirmed that he met with the Defendant after September 25, 2007. Agent Calcagno estimated that the first meeting took place in early October of 2007 at the FBI office in downtown Knoxville. He stated that he and the Defendant spoke in an interview room. Agent Calcagno said that the Defendant was not handcuffed and was free to leave. Agent Calcagno recalled that at least one other officer was present. Agent Calcagno stated that Special Agent Kevin White might have been there and noted that Lt. Henderson had been present at one of the meetings and that Officer Kingsberry had been present at one of the meetings. Agent Calcagno stated that he called the Defendant to ask him to meet.

Agent Calcagno recalled another meeting at the HIDTA office and another meeting at the Defendant's residence. He stated that the meeting at the HIDTA office took place first, and the meeting at the residence took place later. Agent Calcagno explained that he requested the meeting at the HIDTA office by telephone. Agent Calcagno said the Defendant was not handcuffed at the meetings and could leave if he wanted to.

Agent Calcagno confirmed that he met with the Defendant on April 1, 2008. Agent Calcagno explained that the Defendant had been very difficult to contact and that officers also wanted additional information from the Defendant. Agent Calcagno stated that Lt. Henderson went to the

14

Defendant's residence. Agent Calcagno testified that the meeting was consensual, that the Defendant was not handcuffed, and that the Defendant left afterward.

On cross examination, Agent Calcagno confirmed that, at the time officers entered the Defendant's home, he was standing outside of the house—to the side, toward the back. Agent Calcagno said he was at the Defendant's residence for a while before he interrogated the Defendant. Agent Calcagno stated that the Defendant was advised of his Miranda rights at 1:52 a.m. Agent Calcagno explained that he read the Defendant his rights off of a card, but the Defendant did not make a written waiver. Agent Calcagno said that the Defendant was never Mirandized a second time. Agent Calcagno estimated it was thirty minutes from the time officers entered until the Defendant was advised of his Miranda rights.

Agent Calcagno said he did not recall the Defendant's girlfriend being pregnant and confirmed that, to his recollection, one child was present. Agent Calcagno confirmed that he walked around the home and that about ten other officers were in the home. Agent Calcagno stated that he was not with Lt. Henderson during the entire search and confirmed that they were separated many times. Agent Calcagno testified that between the officers' entry into the home and 1:52 a.m., there were times when he was not with Lt. Henderson and could not hear what Lt. Henderson might have said during these times.

Agent Calcagno confirmed that his 302 forms indicate five meetings took place after September 25, 2007, because he believed he prepared a 302 form for each meeting. Agent Calcagno said there could have been meetings, other than those detailed in the five 302 forms, but if there were other meetings, they must not have rendered pertinent information, since no 302 form was filed out. Agent Calcagno did not recall ever picking the Defendant up and bringing him to the HIDTA or FBI

15

office. Agent Calcagno said that there might have been one incident where the Defendant was picked up and brought to an office, but Agent Calcagno did not recall ever personally picking the Defendant up. Agent Calcagno testified that the Defendant was never handcuffed while being transported or at all. Finally, Agent Calcagno said he did not recall making any threats that he would send someone to arrest the Defendant if he did not provide information. However, Agent Calcagno stated that the Defendant was encouraged to be a "proactive cooperator."

## C.    Regina Smith

Regina Smith ("Ms. Smith") testified that the Defendant is the father of her children and that she has lived with him in the past. Ms. Smith stated that in September of 2007 she lived with the Defendant. Ms. Smith said she has three children by the Defendant, who are today ages eleven years old, five years old, and 17 months old.

Ms. Smith could not recall the exact date the officers entered her home, but she said she recalled the events of that night. Ms. Smith said the first thing she heard was the door come down. Ms. Smith said she was awake because she had gotten up to go to the restroom. Ms. Smith said she had been sleeping in her daughter's room. Ms. Smith said the Defendant was sleeping in the bedroom he shared with Ms. Smith, and her son was in his bedroom. Ms. Smith said the officers did not ring the doorbell or knock. Ms. Smith explained that the home's doorbell made a "funny" sound, like a school bell, which she did not hear before the officers entered.

Ms. Smith said that she next saw flashlights and heard officers yelling, "Get down." Ms. Smith said that officers had her down on her stomach, so she informed them she was pregnant. Ms. Smith said she saw her children being brought into the living room. Ms. Smith said that officers made her son lay down and handcuffed him. Ms. Smith recalled that at the time he was ten years

16

old. Ms. Smith said that the officers' treatment of the family was "not good." Ms. Smith testified that officers put the family in the living room and told them to stay there. Ms. Smith said that the officers would not let her be beside the Defendant. Ms. Smith noted that the officers walked the Defendant around the house. Ms. Smith said that she could not hear everything that was said between officers and the Defendant.

Ms. Smith stated that the she was left in handcuffs for ten to fifteen minutes. Ms. Smith said she did not ask for the handcuffs to be taken off. Ms. Smith explained that she heard the Defendant talking to officers about the handcuffs and that he said she was pregnant and had nothing to do with any allegations. Ms. Smith said that her son was left in handcuffs for five to ten minutes. Ms. Smith said she heard the Defendant tell officers to take the handcuffs off, and she thought this was why they were removed.

On cross examination, Ms. Smith stated that she was in the living room the entire time the officers were in the house. Ms. Smith said that she had never been handcuffed behind her back; the handcuffs had been in front the entire time. Ms. Smith stated that she had been in a relationship with the Defendant for thirteen years. Ms. Smith explained that she spent her teenage years in California, came back to Knoxville, and met the Defendant in Knoxville when she was twenty-one, about fifteen years ago. Ms. Smith stated that she did not have a criminal history and now lives in East Knox County with her children.

On redirect examination, Ms. Smith stated that she lived with the Defendant until 2008, and she recalled other incidents where the Defendant was handcuffed by officers. She stated that officers would come to the residence, knock, and get the Defendant. Ms. Smith stated that several times officers came and took the Defendant for a drive to talk. Ms. Smith said that she, herself, saw

17

handcuffs being put on the Defendant and noted that the handcuffs worried her children. Ms. Smith recalled officers telling the children not to worry because they were just taking the Defendant for a ride, not to jail. Ms. Smith described another meeting where the officers came to the house and sat on the porch and talked with the Defendant.

## D.    Donald Flack

The Defendant testified that in September of 2007 he was residing at 4329 Apex Drive. The Defendant said he remembered the entry during the warrant execution and stated that officers did not give any warning before entering. The Defendant explained that each of the three doors–front, back, and side–to the residence have doorbells nearby. The Defendant stated that the doorbells sound like a school bell and are irritating. The Defendant said that he did not hear the doorbell sound and confirmed that he was asleep when officers entered the home.

The Defendant said the first thing he heard the officers say was "Get down." The Defendant said he was in the bedroom and was proceeding toward the officers. The Defendant recalled that the officers had his son on the ground on his stomach. The Defendant said he could see in the room where his son was. He stated that he pushed an officer back, and the officer said that his son was big and the officers could not tell how old he was. The Defendant stated that officers picked his son up and put him in the living room.

The Defendant stated that he did not recognize the officers at the time, but he now recognizes the officer who first spoke to him to be Lt. Henderson. The Defendant testified that Lt. Henderson mentioned Judge Leibowitz. The Defendant said that officers took him outside and Lt. Henderson said, in substance, "I know it's here," and remarked, "Don't bull jive me, or you're going to jail." The Defendant testified that he did not reply but did ask that the handcuffs be taken off his family

18

members.  The Defendant said he was told the handcuffs would be taken off if he showed the officers where they could find drugs.  The Defendant explained that he then took Lt. Henderson in the garage and pointed at a chest of drawers.

The Defendant stated that thereafter Lt. Henderson said, "Look who's here," and the Defendant saw Agent Calcagno come in with his navy FBI jacket on.  The Defendant recalled Agent Calcagno saying that he needed to talk to the Defendant and taking the Defendant downstairs.  The Defendant noted that Agent Calcagno said he had a knack for telling when someone was telling him the truth.  The Defendant recalled being advised of his <u>Miranda</u> rights by Agent Calcagno and explained that Agent Calcagno took a card from his wallet and read the rights.  The Defendant stated that he interrupted Agent Calcagno and told Agent Calcagno that he did not want to talk to officers if he had been read his rights.  The Defendant confirmed that he did not ask to speak to an attorney.

The Defendant recalled then being taken to Lt. Henderson in the kitchen and Lt. Henderson saying that if the Defendant did not talk he would be taken to jail.  The Defendant did not recall his girlfriend or children being mentioned at that point.  The Defendant said that he was then taken back downstairs, and this time, he was read his rights.  The Defendant said that at that point he "started talking," but Agent Calcagno accused him of lying and then took him back upstairs.  The Defendant explained that, once they were back upstairs, Lt. Henderson said that he would, "Round everybody up," to be taken to jail.  The Defendant said that he was concerned about where the children were going to go and explained that he felt it meant that the children would be taken away.

The Defendant testified that he and the officers went back downstairs, he gave them information, and the officers took him out to confirm the information.  The Defendant explained that he decided to give the officers information because, even if his girlfriend was not taken into custody,

19

he felt that she and the children would not be safe in the house since the door had been rammed in. The Defendant stated that he did cooperate and the officers took him in a jeep-like vehicle to another location where he gave them information. The Defendant recalled that other officers stayed at his residence during that time. The Defendant said that when officers returned to his home, someone gave the instruction to, "Get his number, and we'll contact him." He confirmed that afterwards he was not arrested, "taken downtown," nor placed in custody.

The Defendant then described his subsequent contact with officers. He stated that the first contact was a week or so after the execution of the warrant. The Defendant said that Agent Calcagno had called him, but he delayed meeting with Agent Calcagno because he had transportation problems and no way of getting to the meeting. The Defendant stated that he eventually went on his own to the FBI office, on his first trip. The Defendant explained that he felt he had no choice but to go. The Defendant explained that he met with Agent Calcagno. He stated that he needed to meet with Agent Calcagno because he needed to get his identification[4] that Agent Calcagno had kept after the search. The Defendant said that he left the first visit with his own transportation. The Defendant thought that he had borrowed a car to make it to the first visit after Lt. Henderson came to his house and warned him that he needed to talk to Agent Calcagno.

The Defendant stated that Lt. Henderson would come to his house whenever the Defendant missed a call. The Defendant stated that he was afraid of Lt. Henderson and Agent Calcagno because he did not know what was going on and they were making demands about him talking. The Defendant said that Agent Calcagno kept calling him, but he did not answer. The Defendant testified

---

[4]The Defendant's testimony was not clear as to what type of identification, i.e. a driver's license, Agent Calcagno had in his possession.

that as a result Lt. Henderson made another visit to his home. The Defendant stated that Lt. Henderson made at least four such visits to his home.

The Defendant recalled an incident during which officers forcibly removed him from his home. He stated that officers came to the house on an overcast day and were concerned about him telling others about his cooperation. The Defendant said he told officers that he had not talked to anyone about the information. The Defendant said that this visit was the one at which officers assured his kids that he was not being arrested. The Defendant recalled that Agent Calcagno did not come to the house; he was at the HIDTA office on Middlebrook. The Defendant said he was transported in handcuffs to the HIDTA office. The Defendant noted that he remembered his girlfriend had given birth by that time, and a female officer held the baby for while. The Defendant denied that the officer held the baby in a way that would imply she might take it away.

The Defendant stated that the officers took him home after the meeting, but he maintained that during the meeting he felt that he was not free to leave because he was handcuffed and without transportation. The Defendant said he was in a locked room, surrounded by officers, and handcuffed. The Defendant also noted that Agent Calcagno drew a football field model to illustrate the level of cooperation that was expected, and the Defendant again stated that he was in handcuffs the entire visit.

The Defendant recalled another visit from Lt. Henderson in April of 2008, during which Lt. Henderson said he was too busy to be following the Defendant around. The Defendant stated that he was not handcuffed during this visit, and recalled only Agent Calcagno and Lt. Henderson being present. The Defendant stated that this was the last such meeting.

The Defendant again testified that he drove himself to his first visit with Agent Calcagno. He testified that between September of 2007 and April of 2008, he was forcibly taken to other locations twice.[5] The Defendant stated that the second time he was taken "uptown" to the FBI office. The Defendant noted that being taken to the offices started to feel like standard procedure when he did not answer calls—more specifically, he said the standard procedure was to put handcuffs on him and "grab" him. The Defendant noted that the officers were trying to get to Mr. Hartsell.

Finally, the Defendant said that after the evening of the search, and the comment about rounding up the residence's occupants to be taken away, there were no subsequent threats against his family, although he was told to think of his future.

On cross examination, the Defendant again stated that Lt. Henderson was the first officer he spoke to during the execution of the search warrant, although he again stated that he did not know Lt. Henderson's name at the time. The Defendant said he was brought outside to an area of the sidewalk below the front porch. The Defendant recalled staying there no more than three minutes. The Defendant said that other officers were there, but Lt. Henderson was the only officer who was talking. The Defendant said he was then taken back inside the house in handcuffs. The Defendant stated that at that time Lt. Henderson told the Defendant about Judge Lebowitz and said not to "bull jive" him. The Defendant testified that at that point he saw his girlfriend and children.

The Defendant explained that his son, at the time, was nine or ten years old, but the Defendant stated that he was big for his age. The Defendant denied that he would look older than he is because he still had "baby fat" that made him look young.

---

[5]Although the Defendant's testimony was not completely clear, it appears that the Defendant's recollection of two times includes the previously described incident where he was taken to the HIDTA office.

22

The Defendant said he told Lt. Henderson that his family had nothing to do with the allegations. The Defendant noted that he never conducted business in front of his family and that "whatever comes to light" was him, and he was responsible not them. He noted drug dogs were brought in. The Defendant opined that the dogs would find the drugs, but he said he told the officers where the drugs were and they had taken his handcuffs off. The Defendant noted that the drugs were hidden where his children could not find them, but he agreed they were not hidden very well and that officers would find them. The Defendant noted that the warrant to search was because of Mr. Hartsell.

The Defendant said Lt. Henderson made statements that the Defendant knew where the drugs were hidden. The Defendant said that after Lt. Henderson took the handcuffs off of his girlfriend and the children he walked the officers through the rooms and pointed, leading them to the drugs. The Defendant said that, thereafter, Agent Calcagno brought in drug dogs and told the Defendant that they needed to talk. The Defendant said they went to the basement, Agent Calcagno pulled out the card to read the Defendant his rights, and the Defendant stated that he would not talk if advised of his rights. The Defendant noted that he had them read to him before, but he was not sure how many other times in his life he had been advised of his rights. The Defendant stated that Agent Calcagno left the basement but another officer remained in the basement with the Defendant. The Defendant explained that the other officer brought the Defendant upstairs, and at that point, Lt. Henderson said that, if the Defendant did not talk, he was going to jail. The Defendant said he was taken back downstairs and Agent Calcagno finished reading the rights, without the Defendant interrupting.

The Defendant confirmed that at the time the search warrant was executed and during the subsequent period he was employed at Chesapeake's, a downtown Knoxville restaurant. The Defendant confirmed that because he was working downtown the meetings with officers took place downtown.

Finally, the Defendant said that he had not seen the 302 forms. The Defendant said he had seen a letter listing five meetings. The Defendant briefly restated that he was handcuffed at the meeting on the overcast day took place at the HIDTA office on Middlebrook, and the second time he was handcuffed was at the FBI office. The Defendant stated that Lt. Henderson handcuffed him both times.

## II.    FINDINGS OF FACT

Based upon the testimony at hearing, the exhibits admitted into evidence at the hearing, and the parties' memoranda, the Court finds the following facts. Where the Court notes that there is conflicting testimony and has not made a finding as to which testimony it credited, the Court will discuss its factual findings and legal analysis of the conflicting testimony in the analysis portion of this Report and Recommendation.

On or about September 21, 2007, Agent Calcagno and other agents and officers were conducting surveillance of drug-related activities related to Mr. Hartsell. Agent Calcagno and his team used a CI to conduct at least two controlled buys with Mr. Hartsell including a controlled buy on September 21, 2007, and a controlled buy on September 24, 2007. The officers equipped the CI with a recording device on, at least, the initial buy. The officers also conducted surveillance of 4329 Apex Drive as part of their operation because Mr. Hartsell would visit this home after receiving the CI's money but before returning and giving the CI the purchased drugs. The officers believed that

24

Mr. Hartsell was getting the cocaine he was selling to the CI from the home at 4329 Apex Drive.

Based upon Lt. Henderson's sworn affidavit which the Court has reviewed and which recites the details of the controlled buys and surveillance and accompanying attachments, Judge Lebowitz issued a search warrant for 4329 Apex Drive at 11:32 p.m. on September 24, 2007. Lt. Henderson's affidavit contained a number of errors. These included: (1) on the last line of the first full paragraph on page three of the affidavit, the statement, "The cash was copied prior to giving it to the CI so that the cash could later be identified if found in the possession of Germany Hines, alias," which includes an incorrect name; (2) the last line of the third full paragraph on page three of the affidavit, which states "Rich Calcagno saw Mark Hartsell, alias, hand the CI what was later determined to be cocaine," is not true; and (3) the statements on page two that there was confusion about whether Mr. Hartsell went into 4329 or 4333 Apex Drive when in fact it may have been that there was confusion about whether he went into 4329 or 4319 Apex Drive.

The warrant was executed by ten or so officers and agents at approximately 1:00 a.m. on September 25, 2007. The officers employed a battering ram to get into the home, they knocked and announced, but did not use the door bell. Lt. Henderson entered the home within a minute or so of the first officer, and Agent Calcagno, who had been covering a side door during the initial entry, entered the home approximately five minutes after the initial officer's entry. Lt. Henderson engaged the Defendant, and Agent Calcagno looked around the house.

At the time of the entry, the Defendant was asleep in his bedroom. His girlfriend, Ms. Smith, was awake and was either in her daughter's bedroom or on the way back to the bedroom from the restroom. The Defendant's children were in their respective bedrooms. All the home's occupants were gathered in the living room, and the Defendant was taken outside to talk to officers. The

25

Defendant was handcuffed for at least the majority of the search. Ms. Smith was handcuffed for ten to fifteen minutes.[6]

The Defendant's initial conversation was with Lt. Henderson. During the interaction, Lt. Henderson stated that Judge Lebowitz said "hello." Lt. Henderson also told the Defendant that he knew there were drugs in the house and told the Defendant, in substance, not to give him the run-around and to come clean or the Defendant would be taken to jail. The Defendant stated that Ms. Smith had nothing to do with the alleged crimes. The Court finds and Lt. Henderson conceded, the Defendant was detained and in custody and that Lt. Henderson asked the Defendant where drugs were hidden in the house prior to advising the Defendant of his <u>Miranda</u> rights. The Defendant directed Lt. Henderson to a chest of drawers that contained cocaine.

Within thirty to forty minutes of the initial entry Agent Calcagno and Agent Burnett took the Defendant into the home's basement, and Agent Calcagno, whether after an interruption or not, advised the Defendant of his <u>Miranda</u> rights by reading from an advice of rights card at approximately 1:52 a.m. The Defendant did not request an attorney's presence during the interview.

---

[6]The Court was presented with somewhat conflicting testimony as to whether Ms. Smith was handcuffed. The Defendant and Ms. Smith testified that she was handcuffed. The Defendant testified that Ms. Smith handcuffs were removed because he began cooperating with officers. Ms. Smith testified that it was her impression that the handcuffs were removed for the same reason. Lt. Henderson testified that Ms. Smith was handcuffed and the handcuffs were removed so that she could care for the children. Agent Calcagno did not recall Ms. Smith being handcuffed.

The Court was also presented with conflicting information about whether the couple's son was ever handcuffed. The Defendant and Ms. Smith maintained that he was. Lt. Henderson and Agent Calcagno maintained that the son was never handcuffed.

Based on the testimony of the Defendant, Ms. Smith, and Lt. Henderson, the Court finds that Ms. Smith was handcuffed for ten to fifteen minutes. The Court finds that it is not necessary to make a finding as to whether the Defendant's son was ever handcuffed, because at most, Ms. Smith has testified that he was handcuffed for the first five or ten minutes after the officers' entry. The Court, as more fully explained below, has determined that any statements made in this period should be suppressed, regardless of whether the Defendant's son was handcuffed, and accordingly, the Court declines to make a finding on this issue as it is inconsequential to the analysis of the suppression issue.

The Court further finds the Defendant was fully aware of his <u>Miranda</u> rights by virtue of his own testimony. During the interview, the Defendant cooperated, and Agent Calcagno, at times, left the basement to relay information to other officers or to receive reports of the search results. The Court does not find that the officers threatened to arrest or "round up" the Defendant's family members.[7]

Officers found a quantity of cocaine in the home, which forms the basis for the current charges.[8] After the search of his home was completed, the Defendant was taken to another location to continue his interview and confirm some of the information he had given as part of his cooperation. A number of officers remained at the Defendant's home after he was taken away. The Defendant was allowed to return to his home that night and was not placed under arrest.

The Defendant participated in approximately five subsequent meetings with Agent Calcagno after the search of his home, as part of the Defendant's agreement to cooperate with the officers' investigation. Lt. Henderson and other officers were present at some of these meetings, although the officer composition varied by meeting. The first of these meetings took place approximately a week after the search, during the first week of October, at the FBI office downtown. Agent Calcagno called the Defendant to request the meeting. The Defendant initially could not find transportation

---

[7]The Defendant testified that he was taken back upstairs a number of times. Agent Calcagno did not describe any such breaks. The Defendant maintains that it was during one of these trips upstairs that Lt. Henderson made a threat that, "I'll round up everyone." The Court acknowledges the conflicting testimony on this issue. Lt. Henderson denied making such statements, and Agent Calcagno denied hearing any such statements. Furthermore, Ms. Smith, who was there the entire time did not corroborate the Defendant's testimony. Accordingly, the weight of the evidence is against the Defendant's contention. However, for the reasons more fully explained in the Court's analysis, the Court finds that, even if these breaks took place and the threat about "rounding up" everyone was made, the Defendant's cooperation and statements were voluntarily made and not based on that statement, nor the product of coercion.

[8]Neither the Defendant nor the Government have presented evidence or testimony specifying exactly what controlled substances were found, where they were found, and when they were found. Based upon the testimony of Lt. Henderson and the Defendant, the Court has found that cocaine was found in the home, ostensibly in the chest of drawers and in areas of rooms where the Defendant "pointed."

to the meeting, but he later secured use of a car to make the trip and voluntarily drove himself to the meeting.

A second meeting at the HIDTA office was initiated by Agent Calcagno sometime before the spring of 2008.[9]  According to Agent Calcagno's calculation that five meetings took place based upon his 302 forms, *see supra* at 15, additional meetings and/or telephone calls may have taken place during this period.  Some meetings were apparently at the Defendant's home, where he was not handcuffed, and one meeting was held on the Defendant's porch.  In April 2008, Lt. Henderson made a final visit to the Defendant at his home.  Lt. Henderson and Agent Calcagno were present at the meeting, but there is no indication that the Defendant was taken from his home at that time.

The Indictment in this case was filed three months later on July 1, 2008.

## III.    ANALYSIS

The Defendant has filed a Motion to Suppress Physical Evidence [Doc. 33] and a Motion to Suppress Statements [Doc. 35].  For the reasons more fully explained below, it is **RECOMMENDED** that the Defendant's Motion to Suppress Physical Evidence **[Doc. 33]** be **DENIED** and the Defendant's Motion to Suppress Statements **[Doc. 35]** be **GRANTED IN PART** and **DENIED IN PART**.

### A.    Motion to Suppress Statements [Doc. 35]

In his Motion to Suppress Statements [Doc. 35], the Defendant moves to suppress all statements he made to officers and agents during or after the search on September 25, 2007.  As

---

[9]The Defendant and Ms. Smith offered testimony that the Defendant was handcuffed and taken to at least one of these meetings.  Lt. Henderson and Agent Calcagno maintained that the meetings were consensual and did not employee handcuffs.  As more fully explained below, the Court finds the officers' testimony to be more credible than the Defendant's or Ms. Smith's testimony on this issue.

28

grounds for suppression, the Defendant alleges that his Fourth, Fifth, Sixth, and Fourteenth Amendments under the United States Constitution were violated. The Defendant's statements can be divided into three discrete categories: those made on September 25, 2007, before he was advised of his Miranda rights and those made after he was advised of his Miranda rights, and those made during encounters with officers and agents after September 25, 2007. The Court will address the admissibility of each category of statements in turn.

1.  *Statements Made by the Defendant on September 25, 2007, Before He Was Advised of His Miranda Rights*

The Fifth Amendment of the United States Constitution protects against a defendant being "compelled in any criminal case to be a witness against himself." In order to further this protection and other constitutional rights, the Supreme Court of the United States has held that a suspect must be informed of certain constitutional rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), prior to being subjected to custodial interrogation or its equivalent. Id. at 444-45. As the Court in Miranda explained, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Id. at 444. These safeguards include advising the suspect of his or her right to remain silent, that any statement made may be used against him or her, and that the suspect has a right to have an attorney, either retained or appointed, present at questioning. Id. at 445.

However, the safeguards outlined in Miranda attach only where a defendant is subjected to custodial interrogation. Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any

29

significant way." Id. at 444. Thus, a defendant must be advised of his or her Miranda rights when two elements are present—custody and an interrogation.

The Defendant maintains that any statements made in the period between the officers' entry into the Defendant's home and his being advised of his Miranda rights should be suppressed because the Defendant had been taken into custody and had not yet been informed of his rights. The Government itself concedes that the Defendant was in custody for a period of approximately forty minutes before he was advised of his Miranda rights. [Doc. 53 at 3]. The Government further concedes that because the Defendant was subjected to custodial interrogation without being advised of his Miranda rights, any statements made during this period should be suppressed. [Doc. 53 at 2].

The Government explains its concession by stating, "Although the United States is unaware of any pre-Miranda statements by the defendant other than statements regarding the location of the drugs in the residence, it agrees that the defendant was in custody during the execution of the search warrant and that any interrogation of him must have been preceded by a Miranda rights advisement." [Doc. 53 at 1]. Thus, the Government "agrees that any custodial, pre-Miranda statements made by the defendant on September 25, 2007, should be suppressed." [Doc. 53 at 7].

After reviewing the facts of this case, the Court is in agreement with the parties' position that suppression is warranted. It is well-established that for purposes of determining whether a person was "in custody" at a particular time, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984); United States v. Mahar, 801 F.2d 1477, 1499 (6th Cir.1986). The warrant in this case was executed by numerous officers at a late hour. The officers gained entry to the house by knocking down the front door while the Defendant slept, and upon entering the house, by all accounts, the

30

officers handcuffed at least the Defendant and his girlfriend. A reasonable person in the Defendant's position would have believed that he was in custody and was not free to leave. Thus, the Court finds the Defendant was taken into custody prior to being informed of his Miranda rights.

The Court also finds that the Defendant was interrogated prior to being advised of his Miranda rights. As the United States Supreme Court has explained, "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). In the present case, Lt. Henderson testified that he asked the Defendant where the drugs were before the Defendant was informed of his Miranda rights. This question undoubtedly constitutes express questioning that is reasonably likely to elicit an incriminating response. Id. Thus, the Court concludes that the Defendant was subjected to interrogation prior to being advised of his Miranda rights.

Accordingly, the Court agrees with the parties and finds that the Defendant was subjected to custodial interrogation prior to being advised of his rights under Miranda and that, therefore, his constitutional rights were violated. On this basis, the Court finds that any statements made by the Defendant in response to Lt. Henderson's question about the location of the drugs or in response to related or similar interrogation prior to being advised of his Miranda rights should be suppressed.

Because the Court has found that the statements made prior to the Miranda warnings should be suppressed due to constitutional violations and because the Court has found and the Government agrees that the Defendant made statements "regarding the location of the drugs in the residence," the Court will also examine whether the cocaine, which was located based on these statements, should

31

should also be suppressed. The United States Supreme Court has held that both physical and verbal evidence obtained in derogation of the Fourth Amendment must be excluded from trial, as the fruit of the poisonous tree. Wong Sun v. United States, 371 U.S. 471, 485-86 (1963). The "fruit of the poisonous tree doctrine" excludes not only that evidence that was illegally seized, but all evidence gained from the " 'exploitation' " of an illegal search and seizure unless that evidence is sufficiently attenuated from the illegal actions as to " 'purge [it] of the primary taint.' " Id. at 488 (citing Maguire, Evidence of Guilt, 221 (1959)).

In an apparent effort to avoid such exclusion, the Government arguably, though briefly, alluded to the inevitable discovery exception through its questioning of the Defendant and in a summary of Lt. Henderson's testimony [Doc. 53 at 2].[10] However, the Government never actually argued this exception in its pleadings or at the hearing. The inevitable discovery rule excepts from exclusion those items that were unlawfully obtained if they would have been inevitable discovered. See Nix v. Williams, 467 U.S. 431 (1984). However, the rule applies only "when the government can demonstrate either the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or other compelling facts establishing that the disputed evidence inevitably would have been discovered." United States v. Kennedy, 61 F.3d 494, 499 (6th Cir.1995).

The Government asked the Defendant approximately three questions that alluded to the inevitability of discovering the cocaine in the chest of drawers. The Defendant initially responded to these questions by stating that his children would not have found the drugs, but on further

---

[10]The Government stated that Lt. Henderson testified that the drugs would have been found inevitably. The Court agrees that Lt. Henderson testified that the search would continue regardless of the Defendant's statements; however, Lt. Henderson, at most, implied that the drugs would have been found.

questioning he agreed that officers would have found the drugs. The Government did not ask either Lt. Henderson or Agent Calcagno specifically about the use of drug dogs or the inevitability of discovering the cocaine in the drawers. There was no proof, other than the Defendant's opinion, demonstrating that an independent, untainted investigation or other compelling facts to establish that the drugs in issue would have inevitably been discovered. Thus, the Court is left to apply the doctrine without specific facts regarding the use of dogs in this search, the exhaustiveness of the efforts in this search, the actual procedures involved in this search, or, more generally, the standard KCSD search procedures.

The Government only briefly alluded to the presence of drug dogs in the house, and then it was only through the testimony of the Defendant. The Government offered no testimony from its own witnesses on the issue and did not plead facts to support inevitable discovery in its filings with the Court. The mere allusion to this exception, without evidence of such or any compelling facts that discovery was inevitable, is not sufficient to prevent the exclusion of physical evidence that was discovered as a direct result of the Defendant's statement. As the Court of Appeals for the Sixth Circuit has held, the inevitable discovery exception is "inapplicable here because at the hearing on the motion to suppress, the government failed to offer evidence concerning the probability of finding the cocaine upon execution of the search warrant." United States v. Finch, 998 F.2d 349, 356 (6th Cir. 1993).

Accordingly, the Court finds that in the absence of evidence concerning the probability of finding the cocaine in issue here, any cocaine which the Defendant directed Lt. Henderson to prior to Agent Calcagno advising him of his Miranda rights may be excluded from evidence as evidence resulting from a coerced statement, see United States v. Sangineto-Miranda, 859 F.2d 1501, 1517-18

(6th Cir. 1988). The Government correctly notes that the United States Supreme Court's recent case law has reminded courts that the exclusionary rule should be "[the] last resort, not [the] first impulse." Herring v. United States, 129 S. Ct. 695, 700 (2009). Nonetheless, the exclusionary rule is appropriate to deter unlawful police conduct, beyond simple omissions, with the goal of assuring trustworthy evidence. See Sangineto-Miranda, 859 F.2d at 1518. Lt. Henderson actively questioned the Defendant about the location of incriminating narcotics while recognizing that the Defendant was in custody. This active questioning took place after officers had forcibly entered the Defendant's residence at 1:00 a.m. and handcuffed the Defendant and his girlfriend. The Court finds that application of the exclusionary rule to any cocaine discovered as a direct result of the Defendant's statements will serve to deter similar police behavior that infringes upon constitutional rights.

2.      *Statements Given by the Defendant on September 25, 2007, After He Was Advised of His Miranda Rights*

The Defendant also argues that the statements he made to officers, specifically Agent Calcagno, after being advised of his Miranda rights were the product of coercion and were not voluntarily given. [Doc. 35, Doc. 52 at 2]. On this basis, the Defendant moves for suppression of these statements. The Government responds that the Defendant's will was never overborne by the actions of Lt. Henderson, Agent Calcagno, or other officers and that the officers' actions were not coercive. [Doc. 53 at 6]. The Government maintains that the Defendant's testimony that statements were made about "rounding everyone up" is not sufficient to warrant suppression. [Doc. 53 at 7].

The essential consideration in determining whether a statement was voluntary is whether the statement was the product of "an essentially free and unconstrained choice by its maker." Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973). If a defendant's will has been "overborn and

34

his capacity for self-determination critically impaired," the use of the statement in prosecution would violate due process. Id. at 225-26. The key issue is whether a confession arises from a defendant's will being overborne. Ledbetter v. Edwards, 35 F.3d 1062, 1070 (6th Cir. 1994). In determining whether a defendant's will was overborne in a particular case, the United States Supreme Court has assessed the totality of all the surrounding circumstances-both the characteristics of the accused and the details of the interrogation. Schneckloth, 412 U.S. at 226. These factors include: the youth of the accused, the lack of education or low intelligence, the lack of any advice to the accused of his or her constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep. Id.

Based upon these considerations, the Court of Appeals for the Sixth Circuit has identified three requirements for a finding that a confession was involuntary due to police coercion: (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement. United States v. Mahan, 190 F.3d 416, 422 (6th Cir. 1999). Further, the Court of Appeals has held that coercion may consist of psychological threats as well as physical threats, and more specifically, the Court of Appeals has found that "threats to arrest members of a suspect's family may cause a confession to be involuntary." Finch, 998 F.2d at 356.

The Court of Appeals for the Sixth Circuit has twice had the opportunity to address whether threats to family members constitute coercive behavior sufficient to overbear a defendant's will and necessitate suppression. In United States v. Finch, 998 F.2d 349, 356 (6th Cir. 1993), at least five officers broke down the defendant's front door in executing a search warrant. Id. at 355. The defendant was at the residence along with a female companion and his mother. Id. The defendant

35

was told that all three persons in the house could be arrested unless one person admitted to sole ownership of any drugs in the home; thereafter, the defendant directed the officers to the garage and showed them where a quantity of cocaine was hidden.  Id.  Officer testimony corroborated that the threat to arrest the defendant's mother and companion was made, and the defendant testified that he disclosed the location of the cocaine to the police so that his mother would not be arrested.  Id.

Based on these facts, the Court of Appeals found that the lower court had erred in denying the defendant's motion to suppress.  Id. at 356.  The court focused upon the fact that the time the threat to arrest was made the police had no basis for concluding that: either woman had knowledge of the cocaine, either woman had knowledge of the defendant's drug-related activities, or either woman was involved in a conspiracy, had constructive possession of the drugs, or was an aider or abettor.  Id.  In sum, the court found there was no probable cause for arresting the women, and "no legal basis existed for threatening to do so."  Id.  Thereafter, the court concluded, that even viewing the record in the light most favorable to the government, the defendant's statement was involuntary and was taken in violation of his right against self-incrimination.

The Court of Appeals clarified the application of the Finch ruling in United States v. Johnson, 351 F.3d 254 (6th Cir. 2003).  In Johnson, the court affirmed that whether the threat to prosecute a family member could have lawfully been executed was a primary consideration in determining whether suppression was appropriate.  Id. at 263.  The court found that in Johnson a sufficient factual basis existed for threatening to arrest the defendant's half-sister.  Id.  The court noted that the defendant had no permanent home and was running a drug distribution business out of his half-sister's home.  Id. at 257 and 263.  The court discussed the fact the business entailed frequent visits from a large number of customers, and concluded that the half-sister "must at least

36

have had very strong suspicions about her half-brother's activities." Id. at 263. Further, the court emphasized that the drugs were found under a bed occupied by the half-sister. Ultimately, the court concluded that probable cause existed to arrest the half-sister and police would not have been acting wrongfully if they were to do so. Id. Accordingly, the court found the threats were not coercive and suppression of the defendant's statements was not warranted. Id.

Turning to the facts of the present case, Lt. Henderson testified he did not make and Agent Calcagno testified he did not hear any statements about "everyone being taken to jail" or "rounding everyone up." The Defendant testified that such a statement was made to him at least once. However Ms. Smith, who was also present, did not corroborate the Defendant's testimony on this issue. The Court has found that based on the preponderance of the evidence, and credibility of the witnesses, that such statements were not made. Similarly, the Defendant and Ms. Smith testified that their son was handcuffed for at least a period of time, but Agent Calcagno and Lt. Henderson did not recall the boy being handcuffed.

Even if the Court were to assume *arguendo* that officers at the scene handcuffed the son for a period of time and that officers threatened, at least once, that everyone could be taken to jail, the Defendant has not demonstrated that this coercive behavior was the "crucial motivating factor in the defendant's decision to offer the statement." Mahan, 190 F.3d at 422. In fact, the Defendant and Ms. Smith's testimony, along with the officers' testimony, supports the opposite conclusion.

Initially the Court notes that, even if the Court were to credit the Defendant and Ms. Smith's testimony that their son was handcuffed, Ms. Smith testified that her son was only handcuffed for five to ten minutes. All the testimony in the record indicates that, at the earliest, Agent Calcagno began interviewing the Defendant approximately thirty minutes after the initial entry into the house.

37

Thus, even if the son was handcuffed, he had been released from the handcuffs by the time the Defendant was advised of his rights. Similarly, Ms. Smith's testimony also indicates that her handcuffs had been removed before the Defendant was advised of his rights. The Court finds that the handcuffs that were placed on Ms. Smith and possibly her son were removed before the Defendant was advised of his rights, and because the Court has determined that statements, made prior to the Defendant being advised of his <u>Miranda</u> rights, are to be suppressed, the alleged handcuffing is of no consequence to the Court's analysis. In the same vein, the handcuffing has no influence on the Court's analysis of whether the Defendant's will was overborne after being advised of his rights.

The Defendant testified that, after he interrupted Agent Calcagno's attempt to advise him of his rights, he was taken to Lt. Henderson in the kitchen and told that if he did not talk he would be taken to jail. The Defendant specifically recalled that his girlfriend and children were not mentioned at that time or in relation to that threat. According to the Defendant's testimony, he then went back downstairs, Agent Calcagno then advised him fully of his <u>Miranda</u> rights, and he began to talk to Agent Calcagno. The Defendant explained that thereafter Agent Calcagno accused the Defendant of lying, and the Defendant was then taken back upstairs. It is at that time the Defendant claimed that a threat was made about his girlfriend and children going to jail. At the hearing, the Defendant initially claimed that the threat concerned him because he was afraid of where the children would be taken. However, when the Defendant was asked directly why he decided to give information to the officers, he explained that even if his girlfriend was not taken into custody he felt that she and the children would not be safe in the house, since the door had been rammed down.

38

Thus, even though the Court has found that such alleged threats were not made, the Court further notes that, even if it were credited, the Defendant's rendition of the timeline in this matter is contradictory and indicates that the Defendant was talking to officers and giving them the information they desired even before the officers allegedly made a direct threat against his family.[11] The Defendant's cooperation in the interview before the threat against his family was made indicates that it was not the threat of them going to jail that motiviated his statements.

Further, the Defendant's explanation of why he gave the officers the information they wanted indicates that it was the idea of his family being left alone with a broken door, not the alleged threat that they would be taken into custody that motivated the Defendant. It appears to the Court that the Defendant, likely because of his prior experience with law enforcement, knew that if he cooperated with officers and agreed to cooperate further, he would not be arrested and would be allowed to stay at his home that night. If he were allowed to remain at home, he could either remedy the door or provide protection if the door remained off its hinges or broken. The scenario did play out in just this fashion. The Defendant cooperated and was left at his home, with his family. While the Defendant's concern about his family is not to be faulted, it undermines even the contention that a threat about the Defendant's family going to jail actually motivated the Defendant to make his statements. Rather, the Defendant appears to have been motivated by his desire to stay home.

In sum, the Court finds that, even if the Court were to assume that the officers made the statements alleged, and, for a time, had the Defendant's son in handcuffs, the Defendant has failed

---

[11] In his Memorandum [Doc. 46] in support of his motion, the Defendant indicates that the comment that "everyone would go to jail" was made by Lt. Henderson, prior to him even being introduced to Agent Calcagno. [Doc. 46 at 2]. However, at the hearing, the Defendant testified to only one such threat, and he testified, contrary to the pleadings, that it was made after he had been introduced to Agent Calcagno during the interview with Agent Calcagno in the basement.

to demonstrate that this behavior was the "crucial motivating factor in the defendant's decision to offer [any] statement[s]." Mahan, 190 F.3d at 422. The "crucial motivating factor" is an element and requirement, and the Court of Appeals for the Sixth Circuit has concluded that, without a demonstration of such, suppression is not warranted. See McCall v. Dutton, 863 F.2d 454, 459 (6th Cir. 1988) ("[P]etitioner must prove that his will was overborne *because* of the coercive police activity in question. If the police misconduct at issue was not the 'crucial motivating factor' behind petitioner's decision to confess, the confession may not be suppressed.") (emphasis in the original); see also Mahan, 190 F.3d at 422 (describing the 'requirements,' rather than factors, for finding that a confession was involuntary). Accordingly, the Court finds that any statements the Defendant might have made to officers after he was advised of his Miranda rights but before the search and interview were concluded should not be suppressed because they were not motivated by coercive police behavior.

Finally, the Defendant has made a generalized allegation that the statements made after the initial constitutional violation should be suppressed as fruit of the poisonous tree. See Wong Sun, 371 U.S. 471 at 488. The Court must consider several factors when determining the voluntariness of a second statement and the influence of the initial unconstitutionality on the subsequent statements. These factors include intervening time, removal of the prisoner to a different place, and change in identity of interrogators. Oregon v. Elstad, 470 U.S. 298, 310 (1985); see United States v. Daniel, 932 F.2d 517 (6th Cir.1991) (finding a second interview, conducted on the day after first interview, was not tainted by any coerciveness present during first interview where the defendant was taken to a second location, re-mirandized, and was interviewed by another officer).

40

The Court has examined the taint that any pre-<u>Miranda</u> statement would have had on statements made later on September 25, 2007, and the Court concludes that the post-<u>Miranda</u> statements are not tainted. The post-<u>Miranda</u> statements made on September 25, 2007, are somewhat susceptible to the taint of the prior statements simply due to temporal proximity. Nonetheless, the factors that are to be considered—intervening time, removal of the prisoner to a different place, and change in the identity of interrogators—indicate that no taint persisted. <u>Elstad</u>, 470 U.S. at 310.

First, the Defendant was moved to the basement, in what all of the witnesses at the hearing implied was a kind of break from the initial search and questioning. In addition, Agent Calcagno was introduced to the Defendant at that time, about thirty to forty minutes after Lt. Henderson and the other officers had entered the home, and Agent Calcagno took the lead in the interrogation. While the intervening time factor does not weigh as strongly against finding that the taint persisted, it does appear that there was a break and intervening time of at least a few minutes between the Defendant's interaction with Lt. Henderson and his interview in the basement. The facts do not indicate a single fluid inquiry given the change in interviewer, change in locale, and the passing time.

In addition, the Defendant was informed of his <u>Miranda</u> rights, and the Defendant maintains that he interrupted these rights in a seeming attempt to keep the interview from becoming somehow more serious or official. The Defendant admitted at the hearing that he had been informed of his rights during other encounters with law enforcement. The Defendant presented no testimony or evidence indicating that the delay in advising him of his rights affected his later statements. The Defendant's own testimony indicates he was trying to engage in a back-and-forth with officers and that he knew that only statements made after he was advised of his rights would be of real use to the

41

officers. Accordingly, the Court finds that the constitutional violations committed prior to the Defendant being advised of his <u>Miranda</u> rights did not affect or taint the interrogation made after the Defendant was advised of his rights on September 25, 2007.

3.    *Statements Made After September 25, 2007*

The Defendant contends that any statements he made to officers in meetings that took place after the initial search on September 25, 2007, were connected to such a degree with his prior statements that the initial taint of any constitutional violation attached to the later statements. [Doc. 52, Doc. 46 at 6-8]. The Defendant argues that because these statements are the fruit of the initial constitutional violation they should also be suppressed. Alternatively, the Defendant argues that if the statements were too remote from the September 25, 2007 search they were nevertheless obtained in violation of <u>Miranda</u>. [Doc. 46 at 8].

The Government responds by maintaining that the statements made on September 25, 2007, were not the product of police coercion, and therefore, the later statements are unaffected because there is no residual unconstitutionality. [Doc. 53 at 2]. The Government maintains that these statements were voluntarily made. [Doc. 53 at 2].

The Court will first examine the Defendant's contention that the statements are tainted by previous unconstitutionality. Again, the Court notes that under the "fruit of the poisonous tree doctrine," the evidence yielded by a illegal search and seizure will also be suppressed from evidence unless that evidence is sufficiently attenuated from the illegal actions so as to purge it of the unconstitutional taint. <u>Wong Sun</u>, 371 U.S. at 488. The factors for determining the connection between the initial unconstitutional interrogation and later questioning include intervening time, removal of the prisoner to a different place, and change in identity of interrogators. <u>Elstad</u>, 470 U.S.

at 310.

For the reasons stated above, the Court has already found that the statements made on September 25, 2007, prior to the Defendant being advised of his <u>Miranda</u> rights, were unconstitutionally obtained because of the officers' failure to advise the Defendant of his <u>Miranda</u> rights prior to his making the statements. However, the Court concluded that post-<u>Miranda</u> the statements were not products of unconstitutional coercion and should not be suppressed. Thus, the only statements that could have produced a "constitutional taint" were the statements made prior to the <u>Miranda</u> warning on September 25, 2007. While the Defendant has not directed the Court to any specific incriminating statements he made during this period, Lt. Henderson did testify that he asked the Defendant about the location of any drugs, and the Defendant responded in an incriminating manner.

The Court has examined the taint that any such statement would have had on statements made during the meetings that followed the search, and the Court concludes that the statements made in these later meetings are not tainted. The Defendant testified that the first of these meetings took place approximately a week or so after the initial search, which is consistent with Agent Calcagno's testimony. At the very least, these statements were made a week after the initial interview, and the Defendant testified that he found his own ride to the FBI office. The conditions had obviously changed, and the meetings that followed were not sufficiently related to the initial meeting for any taint to persist. Furthermore, there was no evidence of any taint or lack of voluntariness presented to the Court. The Court finds that these post-search meetings were not tainted by any unconstitutionality from the initial search on September 25, 2007.

43

Turning to the Defendant's contention that the post-search meetings included independent constitutional violations, the Court credits Lt. Henderson's and Agent Calcagno's testimony regarding the circumstances of these meetings, and based upon their testimony, finds that no constitutional violations occurred during the meetings that took place after September 25, 2007.

The Court has previously reviewed the requirement that, where a person is submitted to custodial interrogation, he or she must first be advised of their rights pursuant to Miranda. In the present case, there is no testimony in the record that the officers advised the Defendant of his rights again after the search on September 25, 2007. Further, Agent Calcagno has testified that the goal of meeting with the Defendant after the initial search was to obtain additional information from the Defendant. Thus, the Court finds that the words and questions presented to the Defendant during these meetings constitute interrogation, because they were "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Innis, 446 U.S. at 301.

Thus, the necessity of Miranda warnings in this case turns upon the question of whether the Defendant was in custody during these meetings. As the Court of Appeals for the Sixth Circuit has explained, determining whether a custodial arrest occurred "is a fact-sensitive inquiry, depending on the totality of the circumstances[,] [for which a] court is to consider a variety of factors," including "transportation of the detainee to another location," and "significant restraints on freedom of movement involving physical confinement or other coercion." United States v. Smith, 549 F.3d 355, 361 (6th Cir. 2008) (quoting United States v. Williams, 170 Fed. App'x. 399, 403 (6th Cir. 2006)).

44

All of the witnesses at the hearing offered testimony about a number of meetings after September 25, 2007, that were undertaken as part of the Defendant's ongoing cooperation with officers. However, no witness was able to testify to the exact order of these meetings, the specific personnel present at the meetings, the length of the meetings, or other details. The Court through the testimony of the four witnesses was provided with general testimony and recollections that: the Defendant met with Agent Calcagno and other personnel approximately five times between October of 2007and April of 2008; these meetings were held at the FBI office, the HIDTA office, and at the Defendant's home; and Lt. Henderson visited the Defendant once or twice when he was not returning calls from Agent Calcagno.

The Court was presented with contradictory testimony regarding the custodial nature of these meetings. The Defendant and Ms. Smith testified that, at one of the meetings, the Defendant was taken from his home in handcuffs. The Defendant maintains that he was forcibly removed from his home on this occasion. The Defendant testified that during this meeting he felt he was not free to leave the office because he was handcuffed and without transportation. The Defendant also stated that he was surrounded by officers in a locked room.

In contrast, Lt. Henderson and Agent Calcagno have testified the meetings were consensual and, further, that the Defendant was never handcuffed. Agent Calcagno also testified that the meetings with the Defendant were initiated by phone, and Agent Calcagno did not recall having made any threats that he would send someone to arrest the Defendant if he did not provide the requested information.

The Court recognizes that the Defendant has an interest in testifying in a way that would exaggerate any officer behavior to make it seem heavy-handed or unconstitutional, and the Court

45

further recognizes that Ms. Smith may have a similar bias given her close relationship to the Defendant. The Defendant also has a prior felony record, and where his or Ms. Smith's testimony contradicts the testimony of Lt. Henderon and Agent Calcagno, two experienced law enforcement officers, the Court finds the officers' testimony to be more credible than the Defendant's or Ms. Smith's testimony. Lt. Henderson and Agent Calcagno freely admitted errors that were made in the investigation of this case and did not attempt to veil or skirt around either the mistakes in the search warrant or the failure to administer <u>Miranda</u> warnings earlier. Furthermore, the entire "arrangement" with the Defendant was based on his voluntary cooperation and the claim that handcuffs were employed does not logically follow. In addition, the Defendant admits that he voluntarily drove to the first meeting, Ms. Smith says one meeting was on the porch, the officers deny using handcuffs at all, and while the Defendant testified he had a transportation problem, he also testified that during this time he was working at a restaurant downtown and because of that the meetings with officers took place downtown. For all these reasons, the Court finds the officers' testimony to be more credible than that of the Defendant or Ms. Smith.

The Court finds that the Defendant went to the FBI office for the first meeting after the search of his own free will. He was not handcuffed and indicated that he arranged his own transportation. Thus, the Court finds that a reasonable person in the Defendant's position would have felt that he or she was free to leave and would not have understood his or her situation to be custodial. <u>See</u> <u>Berkemer</u>, 468 U.S. at 442. Therefore, the Court concludes that the Defendant was not in custody during that visit.

This meeting set a tone for the meetings thereafter. The Defendant knew that the officers had interviewed him and released him, and thus, his fear that the subsequent meetings might lead to

arrest should have subsided. According to the officers' testimony, the Defendant was not handcuffed and these encounters were consensual. The Defendant himself admitted that the officers did not make threats against his family, and Ms. Smith admitted that officers told the children that their father was not being arrested.

Based on the reasons stated herein, the totality of the circumstances, and an assessment of the reliability of the witnesses, the Court finds that the Defendant's freedom was not constrained in a way that a reasonable person in his position would have understood his situation to be custodial. See Berkemer, 468 U.S. at 442. On the whole, a reasonable person in the Defendant's position would have understood that he was expected to cooperate with officers, because as he knew, the officers had grounds upon which to arrest him if they so chose. However, the simple fact that the Defendant was expected to cooperate and could have been arrested if he did not cooperate does not mean that he was under arrest during the meetings. The evidence before the Court, which is full of generalities and contradicted allegations from the Defendant, simply does not support a finding that the Defendant was in custody.

Therefore, as to the issue of the Defendant's Motion to Suppress Statements [Doc. 35], the Court concludes that finds that the Defendant's Motion to Suppress Statements [Doc. 35] should be **GRANTED only to the extent it seeks suppression of statements the Defendant made on September 25, 2007, prior to being advised of his <u>Miranda</u> rights and to the extent it seeks suppression of the cocaine that the Defendant directed officers to in these statements**. However, the Motion should be **DENIED** as to all other relief sought.

47

**B.      Motion to Suppress Physical Evidence [Doc. 33]**

In his Motion to Suppress Physical Evidence [Doc. 33], the Defendant argues that the warrant in this case was issued without probable cause in violation of the Fourth and Fifth Amendments of the United States Constitution. [Doc. 33 at 1, Doc. 47 at 1].   Therefore, the Defendant moves for suppression of all physical evidence obtained as a consequence of the search of his residence on September 25, 2007.   The Defendant maintains that the search warrant issued in this case lacked probable cause.   [Doc. 33].   More specifically, he argues that the warrant failed to establish probable cause within the four corners of the document and also lacked probable cause because Judge Lebowitz was not a neutral and detached magistrate.   The Defendant also maintains that the good faith exception recognized in United States v. Leon, 468 U.S. 897 (1984), does not apply to this case because an objectively reasonable officer would have recognized that the affidavit was so lacking of the indicia of probable cause that he or she could not rely on it in good faith. [Doc. 51 at 2].

The Government maintains that the search warrant was supported by probable cause, that Judge Lebowitz served as a neutral and detached magistrate, and, alternatively, that the good faith exception found in Leon is applicable in this case. [Doc. 54].   The Government reiterates the role of the exclusionary rule as a deterrent and contends that the facts of this case do not warrant its application.

*1.       Probable Cause to Support the Warrant*

The United States Supreme Court has adopted a totality-of-the-circumstances analysis for determining whether probable cause to issue a warrant is presented in the underlying affidavit. Illinois v. Gates, 462 U.S. 213, 238 (1983). The Court explained, "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth

48

in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. Generally, the Court need only consider the four corners of the affidavit in assessing whether it provided probable cause for a search. United States v. Hatcher, 473 F.2d 321, 323 (6th Cir. 1973); Whiteley v. Warden, 401 U.S. 560, 565 (1971).

As in this case, probable cause is often established through an affidavit containing information from a confidential informant. While the reliability of such sources is often established through recitation of prior, successful cooperation, the Court of Appeals for the Sixth Circuit has previously held that in the absence of any indicia of the informants' reliability, an affidavit may detail "substantial independent police corroboration" to establish reliability. United States v. Frazier, 423 F.3d 526, 532 (6th Cir. 2005). This independent police corroboration may be established by a police-monitored controlled buy. United States v. Hawkins, 278 Fed. App'x. 629, 635 (6th Cir. 2008).

"Indeed, law enforcement officers frequently employ controlled purchases of illegal narcotics in order to establish probable cause in circumstances where they cannot personally vouch for the reliability and credibility of a particular confidential informant." Frazier, 423 F.3d at 532; e.g., United States v. Jackson, 470 F.3d 299, 308 (6th Cir. 2006) (concluding that "corroboration of events that occurred during the controlled buy, as set forth in the affidavit, provide sufficient probable cause to sustain issuance of the search warrant"); see also United States v. Coffee, 434 F.3d 887, 894 (6th Cir. 2006) (affirming the district court's conclusion that even though there were no statements in the affidavit about the reliability of the CI, "[the officer's] statements that he set up the controlled buy and took necessary precautions before and after the orchestrated purchase adequately

corroborated the CI's information and, thus, provided sufficient probable cause for the issuance of the search warrant"); United States v. Pinson, 321 F.3d 558, 563 (6th Cir. 2003) (noting that "the affidavit in th[e] case contained [the officer's] personal observation, his pat down of the informant before and after the purchase of the narcotics, and the fact that the drugs purchased by the confidential informant were later tested positive for cocaine base"). The Court of Appeals has held that even a single controlled purchase is sufficient to corroborate an informant's reliability. United States v. Henry, 299 Fed. App'x 484, 487-88 (6th Cir. 2008).

The affidavit in the present case makes no statements about the confidential informant's reliability. It does not recite prior incidents of cooperation by the informant. Nonetheless, the affidavit does describe in great detail two controlled buys, which took place on September 21, 2007, and September 24, 2007, respectively. The affidavit states that both of these buys were supervised by Lt. Henderson and other officers. It further explains that the officers surveilled the confidential informant and Mr. Hartsell and surveilled Mr. Hartsell as he left the meeting with the confidential informant, went to Apex Drive, and immediately returned. The officers conducted a search of the confidential informant's vehicle before the meetings with Mr. Hartsell and assured themselves through surveillance that the confidential informant did not obtain the cocaine found after the meetings from any other source. Further, the affidavit states that Agent Calcagno saw Mr. Hartsell drive to the Apex Drive residence during the first controlled purchase. However, because Agent Calcagno was not able to determine which of the two homes sharing a common driveway Mr. Hartsell went into, during the second buy additional officers were positioned on Apex Drive to help make this determination. The officers also had the confidential informant carry a recording device in the September 21, 2007 purchase, and Lt. Henderson listened to the recording of the purchase.

50

Finally, the affidavit noted that during the first controlled purchase, the officers supplied the confidential informant with identifiable cash, and that prior to the second purchase the confidential informant had telephoned Hartsell asking to purchase cocaine.

The Defendant has drawn the Court's attention to a number of mistakes in the affidavit. First, that the last line of the first full paragraph on page three of the affidavit, which states "The cash was copied prior to giving it to the confidential informant so that the cash could later be identified if found in the possession of Germany Hines, alias," states an incorrect name. In addition, the last line of the third full paragraph on page 3 of the affidavit, which states "Rich Calcagno saw Mark Hartsell, alias, hand the [confidential informant] what was later determined to be cocaine," is not true. Even treating both of these statements as untrue and omitting them, the affidavit details two controlled buys with sufficient details and circumstantial evidence to support a fair probability that contraband or evidence of a crime would be found at 4329 Apex Drive.

The Defendant argues that the circumstances of the second visit to the shared driveway between 4329 and 4319 did not establish a fair probability that contraband or evidence of a crime would be found at 4329 Apex Drive. The Defendant maintains that the affidavit does not establish that Mr. Hartsell actually went into 4329 Apex Drive or that cocaine was delivered to Mr. Hartsell during the time he was at 4329 Apex Drive. As the Court of Appeals for the Sixth Circuit has explained, an "affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." United States v. Allen, 211 F.3d 970, 975 (6th Cir. 2000). Viewing the contents of the affidavit and omitting the untrue statements identified above, the Court finds that the affidavit contains reliable information established through two controlled buys that employed surveillance by numerous officers, recording, the use of identified

51

cash, and controlled conditions. This information, taken from within the four corners of the affidavit, establishes "a fair probability that contraband or evidence of a crime" would be found at 4329 Apex Drive. See Gates, 462 U.S. at 238.

Finally, the Government recognized at the hearing that the affidavit incorrectly identifies the two homes which shared the driveway as 4329 Apex Drive and 4333 Apex Drive. As Agent Calcagno testified, the common driveway is located between 4329 Apex Drive and 4319 Apex Drive. While the Defendant alluded to this error somewhat at the hearing, it was not a primary basis for his suppression motion.

A search warrant must be "sufficient to enable the executing officer to locate and identify the premises with reasonable effort [so that] there is [no] reasonable probability that another premises might be mistakenly searched." United States v. Durk, 149 F.3d 464, 465 (6th Cir.1998). Thus, an officer with knowledge of the place to be searched, who is present at the search, and who can lead others to the place to be searched can cure an address error, like the one in this case, because the officer knows the correct premises to search and there is not danger of mistakenly searching another premises. See United States v. Brown, 49 F.3d 1162, 1169 (6th Cir. 1995) ("the knowledge of executing officers . . . is a factor which may cure any insufficiencies in the search warrant's description of the premises.")

In this case, the alleged error does not go to the street number of the house at which the warrant was executed. The warrant stated that 4329 Apex Drive was the premises to be searched. The only error was that the warrant incorrectly stated that 4333 Apex Drive shared a driveway with 4329 Apex Drive, when in actuality, 4319 Apex Drive shared a common driveway with 4329 Apex Drive. There was in fact no shared driveway between 4333 and 4329 Apex Drive, so it would have

52

been impossible for officers to follow these directions into the incorrect driveway, as the driveway described did not exist.

Further, Agent Calcagno testified that he had been surveilling the house at 4329 Apex Drive during the period between September 21 and 24, 2007. Agent Calcagno had probable cause to believe that Mr. Hartsell had entered 4329 Apex Drive because he had specifically placed officers to watch the entry on September 24, 2007, and Agent Calcagno and the officers had assured themselves that Mr. Hartsell entered 4329 Apex Drive by strategically placing themselves to watch for lights and other indicators as Mr. Hartsell entered. Agent Calcagno, and a number of the officers who had taken part in the surveillance, took part in executing the search warrant, and the presence of these officers, who had prior knowledge of the premises, ensured that another residence would not be entered by mistake. Accordingly, the Court finds that, to the extent that this error is an issue, officer knowledge, specifically the knowledge of Agent Calcagno, cured the mistaken substitution of 4333 for 4319.

The Defendant also alleges that Judge Lebowitz's comment to Lt. Henderson to "Say 'hello' to Mr. Flack" is evidence that she had abandoned her role as a neutral and detached magistrate. The Defendant maintains that because she was not neutral and detached her finding of probable cause is undermined and the search warrant is rendered invalid. For the reasons more fully explained below, the Court finds that Judge Lebowitz's off-the-cuff remark, without any evidence of specific detrimental knowledge or personal interest in this matter, does not undermine the probable cause finding or render the warrant invalid.

Generally, for a magistrate to be able to properly perform the warrant-issuing function, an affidavit must be presented to the magistrate and "must contain adequate supporting facts about the

53

underlying circumstances to show that probable cause exists for the issuance of the warrant." United States v. Weaver, 99 F.3d 1372, 1377 (citing Whiteley, 401 U.S. at 564; Nathanson v. United States, 290 U.S. 41, 47 (1933)). Regardless of the source, the information presented must be sufficient to allow the magistrate or judge to independently determine probable cause; "[the magistrate's] action cannot be a mere ratification of the bare conclusions of others." Weaver, 99 F.3d at 1377 (quoting Gates, 462 U.S. at 239).

Further, the magistrate to whom the affidavit and information are presented must be neutral and detached from the matter at hand. The United States Supreme Court has explained the requirement of a neutral and detached magistrate as follows:

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.

Johnson v. United States, 333 U.S. 10, 13-14 (1948)

Accordingly, the Court of Appeals for the Sixth Circuit has identified two situations in which a magistrate will not be considered "neutral and detached": (1) when she has a personal, direct or monetary interest in the outcome of the case; or (2) she is acting primarily in a law-enforcement capacity. United States v. Bowers, 828 F.2d 1169, 1174-75 (6th Cir. 1987) (citing Tumey v. Ohio, 273 U.S. 510, 523 (1927); Johnson, 333 U.S. at 13-14). The Court of Appeals has further clarified that unsupported claims that the issuing judge has prior knowledge of a defendant are not sufficient evidence of either of these scenarios. See United States v. Barry-Scott, 251 Fed. App'x 983 (6th Cir. 2007) (finding warrant valid despite defendant's claim that issuing judge was not neutral and

54

detached due to judge's prior representation of defendant and her husband on similar, but unrelated, drug charges). Where a defendant alleges that prior knowledge renders a judge not neutral and detached, the defendant must demonstrate that the judge or magistrate either had specific personal knowledge about the defendant that was detrimental to the defendant or had an impact on issuance of warrant, or that the magistrate or judge had personal, pecuniary, or substantial interest in outcome of search. Barry-Scott, 251 Fed. App'x at 993.

In the present case, Judge Lebowitz made a comment which indicates that she had encountered the Defendant at some point through her role in the criminal justice system in Knox County. Such prior knowledge is unremarkable given that repeat-offenders cycle through the same courts numerous times and may very well encounter a judge on more than one matter over the judge's term on the bench. The Defendant has not directed the Court to any evidence that Judge Lebowitz had a personal, direct or monetary interest in the outcome of this case or the execution of the warrant. Nor has the Defendant directed the Court to any evidence that Judge Lebowitz was acting primarily in a law enforcement capacity, and Lt. Henderson's testimony supports the opposite conclusion as he stated that only after preparing the warrant, did the officers met with the judge. Furthermore, this Court finds that the affidavit presented does objectively establish probable cause for issuance of the search warrant in question. Thus, the Court finds that Judge Lebowitz served as a neutral and detached magistrate when issuing the search warrant for the defendant's house on September 25, 2007.

For all of these reasons, the Court finds that the search warrant issued for the home at 4329 Apex Drive on September 25, 2007, was supported by probable cause.

*2.      The Good Faith Exception and Application of the Exclusionary Rule*

The Government has argued that, in the event the Court found that there was no probable cause to support the search warrant, the good faith exception found in United States v. Leon applies to the facts of this case, and suppression is not warranted.  The Government has also presented an alternative position that suppression is not appropriate because it would not accord with the purpose of the exclusionary rule.  Because the Court has found that the warrant was supported by probable cause, it is not necessary to address the merits of these arguments.

Therefore, as to the issue of the Defendant's Motion to Suppress Physical Evidence [Doc. 33], the Court concludes that finds that the Defendant's Motion to Suppress Physical Evidence [Doc. 33] should be **DENIED**.

## IV.      CONCLUSION

After carefully considering the evidence introduced during the course of the evidentiary hearing and after reviewing the relevant legal authorities and the parties' pleadings, the Court finds that any statements made on September 25, 2007, prior to the Defendant being advised of his Miranda rights should be suppressed.  Further, any cocaine that the Defendant led Lt. Henderson to in response to Lt. Henderson's question about where the drugs were located should be suppressed.  All other requested relief should be denied.

**WHEREFORE**, it is hereby **RECOMMENDED** that the Defendant's Motion to Suppress

Physical Evidence **[Doc. 33]** be **DENIED** and the Defendant's Motion to Suppress Statements **[Doc.**

**35]** be **GRANTED IN PART** and **DENIED IN PART**.[12]

                                    Respectfully Submitted,


                                    ___ s/ C. Clifford Shirley, Jr. ___
                                    United States Magistrate Judge

---

[12]Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).