**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 3:08-CR-108** |
| | ) | **(Phillips)** |
| **DONALD FLACK** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

On July 30, 2009, the Honorable C. Clifford Shirley, United States Magistrate Judge, filed a Report and Recommendation ("R&R") [Doc. 55] in which he recommended that the Defendant's Motion to Suppress Physical Evidence [Doc. 33] be **DENIED** and the Defendant's Motion to Suppress Statements [Doc. 35] be **GRANTED IN PART** and **DENIED IN PART**. First, Judge Shirley recommended to suppress any statements made by Defendant on September 25, 2007, prior to him receiving *Miranda* warnings. Second, Judge Shirley recommended to suppress the cocaine (and any other physical fruit) that officers seized during the search on September 25, 2007. Before Defendant received *Miranda* warnings on September 25, 2007, he had made statements revealing the location of drugs in his home. Judge Shirley recommended to suppress the fruits of those unwarned statements. Third, Judge Shirley recommended to not suppress any statements made by Defendant after he received *Miranda* warnings on September 25, 2007. Fourth,

Judge Shirley recommended to not suppress any statements made by Defendant during the later meetings with Lt. David Henderson and FBI Special Agent Rich Calcagno.

This matter is presently before the court on Defendant's timely objections to the R&R [Doc. 59] and the Government's timely objections to the R&R [Doc. 58]. As required by 28 U.S.C. § 636(b)(1), the court has undertaken a *de novo* review of those portions of the R&R to which the parties object.

For the following reasons, the R&R [Doc. 55] is **ACCEPTED IN PART AND DENIED IN PART.** Defendant's Motion to Suppress Physical Evidence [Doc. 33] is **DENIED** in its entirety. Defendant's Motion to Suppress Statements [Doc. 35] is **GRANTED IN PART AND DENIED IN PART**. Accordingly, the court **ORDERS** the following:

• **All statements made by Defendant prior to receiving *Miranda* warnings on September 25, 2007, are suppressed.**

• **The cocaine and any other physical fruit derived from Defendant's statements made prior to receiving *Miranda* warnings on September 25, 2007, are not suppressed.**

• **All statements made by Defendant after receiving *Miranda* warnings on September 25, 2007, are suppressed.**

• **The statements made by Defendant during the five meetings following the search on September 25, 2007, are not suppressed.**

-2-

I.    **STATEMENTS AND PHYSICAL EVIDENCE OBTAINED BEFORE DEFENDANT RECEIVED *MIRANDA* WARNINGS ON SEPTEMBER 25, 2007**

    A.    **Defendant's Motion to Suppress Statements [Doc. 35]**

In his Motion to Suppress Statements [Doc. 35], Defendant moves to suppress all statements made to officers and agents during or after the search on September 25, 2007. Defendant argues that his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments of the United States Constitution were violated.

Defendant's statements can be divided into three categories: (1) statements made on September 25, 2007, prior to Defendant receiving *Miranda* warnings; (2) statements made on September 25, 2007, after Defendant received *Miranda* warnings; and (3) statements made during later meetings with Lt. Henderson and Agent Calcagno after September 25, 2007. The court will now address the admissibility of statements made on September 25, 2007, prior to Defendant receiving *Miranda* warnings.

The Fifth Amendment of the United States Constitution protects persons from being "compelled in any criminal case to be a witness against himself." U.S. Const., Amdt. 5. This Clause, which suppresses testimony at trial, only protects against testimonial evidence. *United States v. Patane*, 542 U.S. 630, 639 (2004) (citing *United States v. Hubbell*, 530 U.S. 27, 34 (2000)).

To protect this right, the United States Supreme Court has held that a suspect must be informed of certain rights before he is subject to "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436 (1966). The *Miranda* safeguards are not automatically triggered when a suspect is questioned; rather, the suspect must be subject to custodial

interrogation.  *Id.*  Custodial interrogation is the "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  *Id.* at 444.

The Government concedes that Defendant was in "custodial interrogation" for a period of approximately forty minutes before receiving *Miranda* warnings. [Doc. 53 at 3].[1]  The court agrees that Defendant was "in custody" and "interrogated" prior to receiving *Miranda* warnings.

To determine if a person is "in custody," the "only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."  *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).  In executing the search warrant, officers knocked down the front door, and handcuffed Defendant and his girlfriend.  A reasonable person in the Defendant's position would not believe he was free to leave.  The court also finds that Defendant was "interrogated" because he was asked questions "likely to elicit an incriminating response from the suspect."  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). During the forty minutes following the entry of Defendant's home, Lt. David Henderson asked Defendant about the location of the drugs.  [Doc. 55 at 26].

Lt. Henderson admits- and the government concedes- that Defendant was not advised of his *Miranda* rights during the forty minutes following the entry of Defendant's

---

[1]  The Government concedes, "Although the United States is unaware of any pre-*Miranda* statements by the defendant other than statements regarding the location of the drugs in the residence, it agrees that the defendant was in custody during the execution of the search warrant and that any interrogation of him must have been preceded by a *Miranda* rights advisement."  [Doc. 53 at 1].

home. The court finds that Defendant was subject to "custodial interrogation" during this period. Accordingly, any statements made by Defendant during this period are **SUPPRESSED**. *Miranda*, 384 U.S. at 467.

### B. Defendant's Motion to Suppress Statements [Doc. 35]

#### 1. The Physical Fruit Derived from Defendant's Unwarned Statements Do Not Have to Be Suppressed Unless the Unwarned Statements Were Made Involuntarily

The issue in this case is not whether Defendant's *Miranda* rights were violated, but rather, whether the physical evidence derived from his unwarned statements should be suppressed. Judge Shirley recommended that the cocaine obtained from Defendant's unwarned statements should be suppressed. However, Judge Shirley failed to determine whether the exclusionary rule was properly triggered in this case.

Judge Shirley was incorrect to suppress the physical evidence derived from Defendant's unwarned statements, without first determining whether there was a constitutional violation. As the Supreme Court has made clear, "a mere failure to give *Miranda* warnings does not, by itself, violate a suspect's constitutional rights . . . " *Patane*, 542 U.S. at 639. Before physical evidence derived from unwarned statements is suppressed, courts must determine whether the statements were made involuntarily. *Id.* The court finds that Defendant's statements- although unwarned- were made voluntarily.

Judge Shirley incorrectly found that because there was a *Miranda* violation, then any physical fruit derived from the statements should be suppressed. As evidenced by the following excerpt from Judge Shirley's R&R [Doc. 55], he confused Fifth Amendment *Miranda* analysis with the Fourth Amendment's exclusionary rule:

-5-

> Because the Court has found that the statements made prior to the *Miranda* warnings should be suppressed due to constitutional violations . . . the Court will also examine whether the cocaine, which was located based on these statements, should also be suppressed. The United States Supreme Court has held that both physical and verbal evidence obtained in derogation of the *Fourth Amendment* must be excluded from trial, as the fruit of the poisonous tree. *Wong Sun v. United States*, 371 U.S. 471, 485-86 (1963).

[Doc. 55 at 31-2] [emphasis added].

The Supreme Court has never applied the "fruit of the poisonous tree" doctrine as a remedy to cure technical *Miranda* violations. *Miranda* protects the Self-incrimination Clause, which is "not implicated by the introduction at trial of physical evidence resulting from voluntary statements." *Patane*, 542 U.S. at 639. "[The] [i]ntroduction of the nontestimonial fruit of a voluntary statement . . . does not implicate the Self-Incrimination Clause. The admission of such fruits presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial." *Id.* at 643. Rather, the "exclusion of unwarned statements . . . is a complete and sufficient remedy for any perceived *Miranda* violation." *Id.*

Judge Shirley recommended that the court apply the exclusionary rule to suppress any cocaine discovered prior to Defendant receiving *Miranda* warnings. [Doc. 55 at 34]. Judge Shirley believes that applying the exclusionary rule to suppress the physical evidence derived from unwarned statements will "deter similar police behavior that infringes upon constitutional rights." *Id.* Judge Shirley's application of the exclusionary rule to physical fruits derived from unwarned statement has been rejected by the Supreme Court. Deterring police conduct is not a concern of the Fifth Amendment "because police cannot

violate the Self-Incrimination Clause by taking unwarned though voluntary statements, an exclusionary rule cannot be justified by reference to a deterrence effect on law enforcement." *Patane*, 542 at 643. Rather, *Miranda*- which only implicates the Fifth Amendment-has a separate remedy for its violation: the suppression of unwarned statements. *Id.* at 633.

In *United States v. Patane*, the Supreme Court held that the failure to give a suspect *Miranda* warnings does not require suppression of the physical fruits of the suspect's unwarned, but *voluntary* statements. *Id.* Even though there has been a *Miranda* violation in this case, that does not mean that the physical evidence derived from Defendant's unwarned statements should be suppressed. *Id.* Rather, the only way that physical evidence obtained from unwarned statements will be excluded is if the statements were made involuntarily. *Id.*

To determine whether a statement was made involuntarily, courts look to the "totality of the circumstances concerning whether a defendant's will was overborne in a particular case." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (quoting *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994)). The purpose is to determine whether police activity was so coercive that it made the defendant's statements involuntary. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). When a defendant claims that a confession was coerced, the Government bears the burden of proving by a preponderance of the evidence that the confession was made voluntarily. *United States v. Johnson*, 351 F.3d 254, 261 (6th Cir. 2003). A confession is involuntary if three requirements are met: (1) the police activity was objectively coercive; (2) the coercion in question was sufficient

to overbear the defendant's will; and (3) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement. *Mahan*, 190 F.3d at 422.

In evaluating whether the statement was made involuntarily, courts consider "the age of the accused, his level of education and intelligence, his physical condition and emotional state at the time of the confession, his expressed fears of violent reprisals, actual physical punishment, the proximity of the coerciveness of the confession as given, and the inherent coerciveness of the confession as given." *United States v. Wrice*, 954 F.2d 406, 411 (6th Cir. 1992). The court also looks at the "length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food or sleep. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Defendant was questioned for approximately forty minutes prior to receiving *Miranda* warnings. [Doc. 55 at 26]. As will be explained in further detail, Defendant was not threatened with physical punishment, nor was he deprived of food or sleep.

The court may also consider the defendant's prior criminal record. *Ledbetter*, 35 F.3d at 1070. Defendant's criminal record- and therefore experience with law enforcement officers- makes it more likely that his unwarned statements were made voluntarily. This is not the first time that Defendant has been interrogated by police officers. Defendant has been convicted for the following crimes: assault, simple possession, aggravated criminal trespass, and aggravated assault. Having been convicted for numerous offenses, Defendant is in a better position to offset any minimal pressure exerted by police officers.

The court will now address the types of coercion that Defendant argues made his unwarned statements involuntary: psychological and physical coercion.

## 2.    Officers Did Not Use Psychological Coercion

Coercion may involve psychological threats as well as physical threats. *United States v. Finch*, 998 F.2d 349, 356 (6th Cir. 1993).  Defendant argues that officers psychologically coerced him into locating the drugs.  [Doc. 55 at 19, recounting the Defendant's testimony at the suppression hearing on June 3, 2009].  In particular, Defendant claims that he made the statements involuntarily because officers threatened to "round everybody up" to be taken to jail.  *Id.*  Defendant claims he thought his children would be taken away unless he directed officers to the drugs.  *Id.*

### a.    Lt. Henderson Never Threatened the Defendant, Regina Smith, or the Defendant's Children

There are three reasons why the police in this case did not make a psychologically coercive threat.   First, the court accepts Judge Shirley's factual determination that Lt. Henderson never threatened to "round up everybody."

In each case where the Sixth Circuit Court of Appeals held that coercive threats were made to third parties, it was never disputed that the threats were actually made.  *See Finch*, 998 F.2d at 351; *Johnson*, 351 F.3d at 263.  However, in the current case the weight of the evidence shows that Lt. Henderson never threatened to "round up everybody."  Approximately forty minutes after the entry into Defendant's home, Defendant was taken downstairs to the basement and interrogated by FBI Special Agent Rich Calcagno. [Doc. 55 at 27].  Defendant testified that he was taken back upstairs many times

during the interrogation. *Id.* Agent Calcagno does not recall such breaks. *Id.* Defendant

maintains that it was during one of these breaks upstairs that Lt. Henderson made a threat

to "round up everyone." *Id.* Defendant claims that this threat was made before Agent

Calcagno administered *Miranda* warnings. *Id.* While there is conflicting testimony on this

issue, the court finds that the weight of the evidence shows that the statement was never

made. *Id.*

Lt. Henderson denied making the comment, and Agent Calcagno denied

hearing it. *Id.* Regina Smith, the Defendant's girlfriend, did not corroborate Defendant's

testimony on this issue. *Id.* While it is true that Ms. Smith was not with Defendant at all

times during the search of the residence (Ms. Smith was secured in the living room while

Defendant walked around the house), the fact that she did not hear Lt. Henderson make

the threat makes it more likely that it was never actually made.

Judge Shirley based his finding on the credibility of Lt. Henderson and Agent

Calcagno. Lt. Henderson has worked in the narcotics unit in the Knox County Sheriff's

Department for thirteen years. [Doc. 57 at 22]. Rich Calcagno is a special agent with the

FBI and investigates drug violations. *Id.* at 68. Agent Calcagno has worked with the

HIDTA Task Force for six years. *Id.* Both officers are experienced in handling drug

investigations, and there is no reason to question their credibility. In contrast, Defendant

has been convicted of numerous offenses, including a felony (aggravated assault). When

the parties disagree on an important fact, the court looks at the evidence as a whole and

makes a credibility determination. The credibility of Lt. Henderson and Agent Calcagno,

in addition to Ms. Smith's inability to corroborate the Defendant's testimony, makes it more

likely that Lt. Henderson never threatened to "round up everybody." Because the court finds that Lt. Henderson never made the threat to "round up everybody," the Defendant's statements about the drug location were made voluntarily. Consequently, the physical evidence derived from Defendant's unwarned statements are admissible at trial. *Patane*, 542 U.S. at 633.

> **b.      Even if the Threat Was Made, It Was Not Coercive Because There Was No Threat to Prosecute a Third Party**

Assuming, *arguendo*, that Lt. Henderson threatened to "round up everybody," that comment did not contain an explicit threat to prosecute third parties. Consequently, Defendant's unwarned statements were not made involuntarily. Three cases are instructive on this issue.

In *United States v. Finch*, officers raided the residence of Ronald Finch to search for cocaine. 998 F.2d at 351. Finch, his mother, and girlfriend were on the premises at the time of entry. *Id.* Officers broke down the front door, locked the bedroom door, and confronted the defendant with drawn guns. *Id.* at 355. After entering the house, but before searching it, the officers interrogated Finch. *Id.* at 351. Finch was told that if any cocaine was discovered, "all three persons in the house could be arrested unless one person admitted sole ownership." *Id.* at 355. Finch then directed the officers to the garage and showed them the cocaine. *Id.*

Finch moved to suppress the physical evidence seized during the raid. *Id* at 351. Finch argued that the statements and evidence obtained were the direct result of

unlawful threats and intimation. *Id.* at 355. Finch testified that he "disclosed the location of the cocaine to the police so that his mother would not be arrested." *Id.* In sum, Finch argued that the information he provided was involuntarily given, and thus, the physical evidence derived from the statements should be suppressed. *Id.*

In finding that the police behavior was "inherently oppressive"- and thus, the statements made by defendant, involuntarily given- the court emphasized the nature of the threat made to Finch's family. *Id.* In *Finch*, there was an explicit threat to prosecute third parties unless the defendant cooperated with the police. *Id.*

In contrast, the phrase "round up everybody" is a general comment, and does not contain an explicit threat to prosecute third parties. The three occupants in *Finch* were told that if any cocaine were discovered, all three persons would be arrested unless one person admitted sole ownership. *Id.* In the present case, the officers did not threaten to arrest anyone. In fact, the words "arrest" or "prosecute" were not used by officers.

In *United States v.Johnson*, police obtained a search warrant for the residence of Johnson's half-sister. 351 F.3d at 257. The police threatened to arrest the half-sister if Johnson did not confess to owning the drugs. *Id.* The half-sister then called Johnson, who returned to the residence. *Id.* Upon returning, Johnson asked to speak with an officer and confessed to owning the drugs found in his half-sister's residence. *Id.*

Assuming, *arguendo*, that the police officers threatened to "round up everybody," that is not a promise of leniency to a third party like in *Johnson*. In *Johnson*, there was an explicit arrangement between the third-party (the half-sister), Johnson, and the police- whereby Johnson would reveal the location of the drugs in exchange for the

-12-

non-prosecution of a third party.  In contrast, officers in the present case did not promise Defendant that they would forgo prosecuting his girlfriend and children if he revealed the drugs.  Assuming that the officers threatened to "round up everybody," such comment did not commit "the police to undertake a specific course of action in return for [defendant's] cooperation."  *Id.*

The current case is also different than *Lynumn v. Illinois*, where police officers made explicit threats to coerce the defendant into confessing.  372 U.S. 528 (1963).  In *Lynumn*, the defendant was prosecuted for drug crimes.  *Id.*  The defendant confessed after police threatened to cut off state financial aid for her infant children.  *Id.*  Officers also warned that the defendant's children would be taken away from her.  *Id.*  The threat was made while the defendant was in the apartment with three police officers and a felon who had purportedly "set her up."  *Id.*  In contrast to the present case, the defendant in *Lynumn* had no previous experience with law enforcement, and believed that the officers would carry out their threats.  *Id.*

Unlike the current case, there is no dispute that the police officers in *Lynumn* threatened the defendant.  *Id.*  When officers arrived at her house, the defendant told them that she was not involved in drug transactions.  *Id.*  The officer then told her that she could get ten years in prison, and that the "children could be taken away, and after I got out they would be taken away and strangers would have them . . . and I had better to do what they told me if I wanted to see my kids again."  *Id.* at 531.  Police officer testimony largely corroborated the defendant's testimony:

> Q.    Did you or anybody in your presence indicate or suggest or say

|            |                                                                                                                                      |
|------------|--------------------------------------------------------------------------------------------------------------------------------------|
|            | to her that her children would be taken away from her if she didn't do what you asked her to do?                                     |
| Witness:   | I believe there was some mention of her children being taken away from her if she was arrested. . . I asked her how did she take care of herself and she said she was on ADC. I told her that if we took her into the station and charged her with the offense, that the ADC would probably be cut off and also that she would probably lose custody of her children. That was not before I said if she cooperated, it would go light on her. |

*Id.* at 533. Officers repeated the threat multiple times. *Id.*

In contrast, officers in the current case never threatened to take the Defendant's children away, cut off financial support, or make any other explicit threat. The only comment that Defendant claims officers said- and which the court has already determined was not made- is that officers would "round up everybody." Assuming that Lt. Henderson actually made this comment, this is nowhere near the level of threat that was made in *Lynum, Johnson,* or *Finch.* Lt. Henderson's alleged comment is far too general to carry the same degree of coercion.

### c. Handcuffing Ms. Smith Did Not Have an Objectively Coercive Effect on the Defendant

Under *Mahan*, a statement is involuntary if three requirements are met: (1) the police activity was objectively coercive; (2) the coercion in question was sufficient to overbear the defendant's will; and (3) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement. 190 F.3d at 422.

Lt. Henderson testified that when he entered the Defendant's house on September 25, 2007, the Defendant was in the back bedroom. [Doc. 55 at 6]. Defendant was then brought onto the porch of the house and handcuffed. *Id.* Defendant was then

-14-

brought back into the house and asked about the location of the drugs. *Id.*

Ms. Smith testified that after the initial entry she was handcuffed for ten to fifteen minutes. "I told them I was pregnant and- because they had me on my stomach. And they turned me around and put handcuffs on me." [Doc. 57 at 125]. Ms. Smith testified that she was never handcuffed behind her back. [Doc. 55 at 17]. Defendant claims that officers told him that they would take the handcuffs off Ms. Smith after he showed them the drugs. *Id.* at 19.

Lt. Henderson testified that Ms. Smith was handcuffed for a short period of time while the area was secured:

> I think after we found out that she may be pregnant, we probably cuffed her in the front. But yes, she stayed handcuffed . . . probably, after we got everything secured and made sure there wasn't any weapons, we probably unhandcuffed her where she could deal with the kids.

[Doc. 57. at 46-7]. Ms. Smith's testimony is consistent with Lt. Henderson's reasons for handcuffing her. *Id.* at 125. Ms. Smith testified, "They put us in the living room. And they was just talking to us. And they told us we couldn't go nowhere, we had to stay right there. . . Like maybe ten or fifteen minutes." *Id.* at 125-26. Ms. Smith was handcuffed to restrain her while the area was secured. Therefore, there was no reason for the Defendant to think that because Ms. Smith was in handcuffs that she was going to be prosecuted. As Lt. Henderson testified, it is common practice for police officers to handcuff persons when securing an area pursuant to a search warrant. *Id.* at 46. It was not objectively reasonable for the Defendant to think that Ms. Smith was going to be prosecuted merely because she was in handcuffs.

The Defendant claims that Ms. Smith was un-handcuffed because of his cooperation with the police. *Id.* at 126. But as already explained, the primary reason why Ms. Smith was un-handcuffed was not because of the Defendant's cooperation with the police; rather, after securing the area it was no longer necessary to restrain Ms. Smith. In addition, concerns about Ms. Smith's health- she was seven months pregnant at the time- may have led officers to un-handcuff her.

Finally, the Defendant and Ms. Smith testified that their ten year old son was handcuffed for five to ten minutes following the entry into Defendant's home. *Id.* at 128. In contrast, Lt. Henderson and Agent Calcagno deny that the boy was handcuffed. Lt. Henderson explained that it is against police policy to handcuff children, and that he did not see the boy handcuffed. *Id.* at 45. Lt. Henderson testified that he walked by the children many times during the search. *Id.* Agent Calcagno also testified that he did not see the boy handcuffed. Based on the credibility of Lt. Henderson and Agent Calcagno, the court finds that the boy was never handcuffed.

### 3.    Officers Did Not Use Physical Coercion

There is no evidence that officers physically threatened or abused the Defendant. While Defendant was handcuffed when he made unwarned statements, he was not physically coerced. The Sixth Circuit has held that being handcuffed does not always indicate physical coercion. *See United States v. Strache*, 202 F.3d 980, 986 (6th Cir. 2000).

In *Strache*, the issue was whether the defendant voluntarily consented to allowing the police to search his apartment. *Id.* Like the current case, the defendant was

-16-

in custody but not advised of his *Miranda* rights. *Id.* The defendant was handcuffed, but the court found his consent to search was made voluntarily. *Id.*

Notably, the court held that "custody [being handcuffed] is not dispositive so long as the potentially coercive effect of custody was mitigated by the circumstances." *Id.* While the defendant in *Strache* was handcuffed, the police did not badger him, physically abuse him, or pressure him. *Id.* Likewise, while Defendant in the present case was handcuffed when he made statements about the drugs, he was not badgered or unduly pressured by the police. Despite being handcuffed, the surrounding circumstances demonstrate that Defendant was not physically coerced into making the statements.

The Sixth Circuit has repeatedly held that being handcuffed is not dispositive of physical coercion. *See United States v. Sylvester*, 2009 WL 1457650 (6th Cir. 2009). In *Sylvester*, the defendant was kept handcuffed in a holding cell for five hours before he was taken to an interrogation room. *Id.* Despite these circumstances, the court held that the defendant voluntarily made the statements in the interrogation room. *Id.* In contrast, the Defendant in the present case was handcuffed for approximately forty minutes and did not spend time in a holding cell. If the Sixth Circuit found that the conditions in *Sylvester* were not physically coercive, then certainly the Defendant in this case was not physically coerced.

Finally, the fact that the interrogation occurred at night does not mean that Defendant's statements were made involuntarily. For example, in *Ledbetter*, the Sixth Circuit held that the defendant's confession was made voluntarily even though the interrogation took place at midnight. 35 F.3d at 1069. In assessing whether a statement

was made voluntarily, courts look at the "totality of the circumstances," and the time of the interrogation is only one factor.

Due to the lack of psychological and physical coercion, the court finds that Defendant's statements made on September 25, 2007, prior to receiving *Miranda* warnings, were made voluntarily. Accordingly, the physical fruit derived from Defendant's unwarned statements (cocaine and any other physical evidence) are admissible at trial. The court will not address the government's alternative arguments as to why the physical evidence should be admitted.[2]

## II. STATEMENTS AND PHYSICAL EVIDENCE OBTAINED AFTER DEFENDANT RECEIVED *MIRANDA* WARNINGS ON SEPTEMBER 25, 2007

### A. Defendant's Motion to Suppress Statements [Doc. 35]

#### 1. *Seibert* v. *Missouri* Guides this Case Because There Was Not a Sufficient Break in Time, Setting, or Content Between Lt. Henderson's Interrogation and Agent Calcagno's Interrogation on September 25, 2007

Approximately forty minutes after the entry into Defendant's home, Defendant was taken to the basement and interviewed by Agent Calcagno. [Doc. 57 at 13]. Agent

---

[2] The court recognizes that the government raised the "inevitable discovery" doctrine as an alternative grounds to admit the physical fruit derived from Defendant's unwarned statements on September 25, 2007. [Doc. 57]. *See Nix v. Williams*, 467 U.S. 431, 444 (1984) (holding that evidence obtained unlawfully will not be suppressed if the government can prove by a preponderance of the evidence that it would have been discovered by lawful means). However, because the court finds that Defendant made his unwarned statements voluntarily - and therefore the physical fruit derived from his unwarned statements was not obtained unlawfully- the court need not address the government's "inevitable discovery" argument.

Calcagno testified that Agent Burnett was present during the interview in the basement. *Id.* Agent Calcagno also testified that Mr. Byrant, an attorney with the KCSD, was in and out of the basement. *Id.* During the interview, there may have been times when Agent Calcagno went upstairs to relay information to other officers. *Id.* at 14. Agent Calcagno testified that he administered *Miranda* warnings to Defendant at 1:52 a.m. on September 25, 2007. *Id.* at 15.

Defendant claims that during this interrogation he was taken upstairs to Lt. Henderson in the kitchen. Defendant claims that Lt. Henderson threatened to arrest him. According to Defendant's testimony, he was then taken back to the basement where Agent Calcagno administered *Miranda* warnings. Lt. Henderson testified that he never threatened Defendant.

In his Motion to Suppress Statements [Doc. 35], Defendant moves to suppress all statements made to officers and agents during or after the search on September 25, 2007. This includes statements made by Defendant to Agent Calcagno in the basement, statements made by Defendant upstairs, and statements made by Defendant on the trip to Chukar Road.[3] Defendant argues that the statements should be suppressed on two grounds. First, Defendant argues that the postwarned[4] statements

---

[3] Defendant directed officers to a house on Chukar Road where officers conducted a search of a house and arrested two individuals. [Doc. 46 at 3].

[4] The court uses the term "postwarned statements" to refer to the statements made by Defendant on September 25, 2007, following Agent Calcagno's administration of *Miranda* warnings. The term "postwarned statements" does not refer to the statements made by Defendant at the five meetings with law enforcement officers following the search on September 25, 2007.

were tainted by Lt. Henderson's failure to previously administer *Miranda* warnings. Second, Defendant argues that his postwarned statements were made involuntarily in violation of the Due Process Clause of the Fifth Amendment. The court will analyze Defendant's "taint" argument first.

The issue is whether the initial failure of law enforcement officers to administer *Miranda* warnings "taints" subsequent admissions made by Defendant after he was advised of his *Miranda* rights. The two principal Supreme Court cases in this area apply different tests so the court must first determine whether this case is guided by *Elstad v. Oregon*, 470 U.S. 298 (1985), or *Missouri v. Seibert*, 542 U.S. 600 (2004). The key factual distinction between the cases is that the defendant in *Elstad* made his postwarned statements after a sufficient break in time and setting, whereas the defendant in *Seibert* made his postwarned statements with no change in setting and a short lapse in time. The Supreme Court described the interrogation in *Seibert* as "sequential interrogation" due to the overlap in content between the questions, the short lapse in time between the pre-and-postwarned statements, and the fact that it was the same person conducting the interrogation in the same room. For the reasons that follow, the court finds that *Seibert* controls the present case.

The facts of this case are much different than the facts in *Elstad*. 470 U.S. 298 (1985). In *Elstad*, police went to the defendant's home to arrest him. *Id.* at 315. Officers told the defendant that they "felt" he was involved in a burglary, and the defendant confirmed that he was. *Id.* at 301. Although the officers failed to warn the defendant of his *Miranda* rights, the Supreme Court found that the questioning in the home had "none of the

earmarks of coercion." *Id.* at 316. For example, the Supreme Court recognized that the failure to warn may have been an "oversight" due to a mistaken belief by the officer that the defendant was not in "custody." *Id.* at 315-16. A day later, the defendant was interrogated at a station house. *Id.* The questions asked at the station house went far beyond those asked at the defendant's home. *Id.* The Supreme Court did not suppress the statements made in the station house because the causal connection between the unwarned questioning and the postwarned questioning was "speculative and attenuated." *Id.* at 313.

The break in continuity between the pre-and-postwarned statements - due to the change in setting, time, and content- is the key to distinguishing *Elstad* from *Seibert*. As a plurality of the Supreme Court recognized in *Seibert*, "it was not unreasonable [for the *Elstad* Court] to see the occasion for questioning at the station house as presenting a markedly different experience from the short conversation at home." *Seibert*, 542 U.S. at 615 (plurality opinion). In *Elstad*, the questioning at the station house was distinct enough in time and setting to remove the taint from failing to administer *Miranda* warnings during the questioning at the defendant's home: " . . . since a reasonable person in the suspect's shoes could have seen the station house questioning as a *new and distinct experience*, the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission." *Id.* at 615-16 (plurality opinion) (emphasis added).

In contrast, in *Seibert* there was not a sufficient break in time, setting, or content to remove the taint from failing to provide *Miranda* warnings during the first line of questioning. *Id.* In *Seibert*, the Supreme Court addressed a "two-step" interrogation

technique, wherein police purposefully interrogated an unwarned suspect, provided *Miranda* warnings "midstream," and then asked questions overlapping in content with the prior questions. *Id.* Following police department policy, the investigating police officer refrained from giving *Miranda* warnings when he first interrogated the defendant. *Id.* The defendant was questioned for thirty minutes, during which time he made inculpatory statements. *Id.* The defendant then received a twenty minute break, followed by *Miranda* warnings. *Id.* The investigating police officer - the same person who had questioned the defendant prior to the short break- proceeded to ask questions that overlapped in content with those the officer had asked prior to the *Miranda* warnings. *Id.* As a plurality of the Supreme Court explained, "[t]he impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given." *Id.* at 616.

Like *Seibert*, there was not a sufficient break in content, setting, or time in this case to remove the taint from Lt. Henderson's failure to administer *Miranda* warnings during the initial interrogation. Like *Seibert*, it would be reasonable to regard the questioning by Lt. Henderson and Agent Calcagno as "parts of a continuum, in which it would be unnatural to repeat at the second stage what had been said before." *Id.* at 617. Neither the Defendant, Lt. Henderson, or Agent Calcagno can recall specific questions that were asked during the interrogations. All that can be recalled is that officers asked Defendant about the location of the drugs. Thus, it appears that there was a direct overlap in content between the questions asked by Lt. Henderson and Agent Calcagno.

In addition, there was only a minimal change in setting between the

-22-

interrogations conducted by Lt. Henderson and Agent Calcagno. Lt. Henderson testified that he asked Defendant questions during the first thirty or forty minutes following the entry of Defendant's home. Defendant did not remain in one room during the questioning, but rather, was moved around the house during the search. Defendant did not receive *Miranda* warnings during this time. Approximately forty minutes after the initial entry, Defendant was taken to Agent Calcagno in the basement. Moving Defendant to the basement was not a sufficient change in setting. Defendant was still being interrogated in his home; he was just moved to a different room. This is much different than the interrogations in *Elstad*, which occurred at two separate locations. 470 U.S. at 316. In *Elstad*, the first interrogation was at the defendant's home, and the second interrogation was at the station house. *Id*.

The court notes that the trip to Chukar Road may have been a sufficient break in setting - possibly even justifying the application of *Elstad* rather than *Seibert*- if Defendant had been advised of his *Miranda* rights following Lt. Henderson's interrogation and then taken to Chukar Road. However, that is not what happened in this case. Defendant was first interrogated by Agent Calcagno in the basement - with a minimal break in time and setting from Lt. Henderson's interrogation- before he was transported to Chukar Road. Thus, the court's "taint" analysis focuses on Agent Calcagno's interrogation in the basement- not the trip to Chukar Road- because that was the next interrogation following Lt. Henderson's questioning.

Finally, there was a minimal break in time between the interrogations conducted by Lt. Henderson and Agent Calcagno. In *Seibert*, the Supreme Court emphasized that a twenty minute break between the pre-and-postwarned questioning was

not sufficient to remove the taint from failing to provide earlier *Miranda* warnings. Here, it is possible that even less time elapsed between Lt. Henderson's interrogation and Agent Calcagno's. It is unclear when Lt. Henderson finished interrogating Defendant, but it is possible that Defendant was asked questions up until the time he was brought downstairs to Agent Calcagno. Because there was not a sufficient break in content, setting, or time between Lt. Henderson's and Agent Calcagno's interrogations, this case is controlled by *Seibert*.

> **2.    It is Unclear Which Test to Apply Under *Seibert* So the Court Will Apply Both Justice Kennedy's Test and the Plurality's Test**

Because the Supreme Court divided 4-1-1 in *Seibert*, there has been some confusion about whether the plurality opinion or Justice Kennedy's concurring opinion controls. However, most courts have recognized Justice Kennedy's concurring opinion as the most narrow[5], and thus, controlling precedent of *Seibert*. It is a well established rule that when interpreting the precedential value of a plurality opinion, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . " *Marks v. United States*, 470 U.S. 188, 193 (1977) (quoting

---

[5] Justice Kennedy's test is more narrow than the plurality's test, which "applies in the case of both intentional and unintentional two-stage interrogations." *Seibert v. Missouri*, 542 U.S. 600, 621 (2004) (Kennedy, J., concurring). Justice Kennedy argues that the plurality's test is too broad: "In my view, this test [the plurality's] cuts too broadly. . . I would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a *calculated way* to undermine the *Miranda* warning." *Id.* (emphasis added).

*Gregg v. Georgia*, 428 U.S. 153, 169 n. 15 (1976)).

Most courts have held that *Seibert* does not overrule *Elstad*, but rather, creates an exception for cases in which the police intend to evade the safeguards of *Miranda* by *deliberately* employing a two-step interrogation strategy. *See United States v. Carter*, 489 F.3d 528, 535-36 (2d Cir. 2007); *United States v. Stewart*, 388 F.3d 1079, 1090 (7th Cir. 2004); *United States v. Kiam*, 432 F.3d 524, 531-33 (3d Cir. 2006); *United States v. Williams*, 435 F.3d 1148, 1161 (9th Cir. 2006).

While the Sixth Circuit in *United States v. Pacheco-Lopez* recognized that most courts have adopted Justice Kennedy's test, it then proceeded to apply the plurality's test.[6]  531 F.3d 420, 427 n.11 (6th Cir. 2008).  It could even be interpreted that the Sixth Circuit in *Pacheco-Lopez* rejected Justice Kennedy's test: "Resolution of whether the police *purposefully* sought to evade *Miranda* is unnecessary, as Lopez's statements are inadmissible even if the police didn't purposefully implement a question first-warn later strategy."  *Id.* at n. 10 (emphasis added).  If the Sixth Circuit had adopted Justice Kennedy's test, it would always start by first determining whether the police purposefully (or "deliberately" in the words of Justice Kennedy) failed to deliver *Miranda* warnings during the initial interrogation.  Bypassing this analysis suggests that the Sixth Circuit has not adopted Justice Kennedy's test.

However, the Sixth Circuit in *United States v. McConer* applied both Justice

_____

[6] "Most circuits have assumed that Justice Kennedy's concurrence operates as the controlling precedent, though others have raised doubts about whether his concurrence actually represents the narrowest grounds for decision.  *United States v. Pacheco-Lopez*, 531 F.3d 420, 427 n.11 (6th Cir. 2008).

Kennedy's test and the plurality's test. 530 F.3d 484, 497-98 (6th Cir. 2008). In *McConer*, the defendant made unwarned statements to a police officer in his bedroom, received *Miranda* warnings, and then was questioned by an officer in the kitchen. *Id.* at 488. The court found that the defendant's statements in his bedroom were not the product of an "interrogation," and thus the admission of the statements at trial did not violate *Miranda*. *Id.* at 496. Having concluded that the defendant was not in "custody" when he made the statements in his bedroom, the Sixth Circuit was not required to apply *Elstad* or *Seibert*. However, that is exactly what the court did. *Id.* at 497-98. The court proceeded to analyze the facts assuming that the defendant was subject to "custodial interrogation" in his bedroom.[7] *Id.* The court analyzed the facts under the *Seibert* plurality's test and Justice Kennedy's test. *Id.*

Thus, it remains unclear which test the Sixth Circuit has adopted. However, in order to resolve the issue presently before the court, it need not determine which test- Justice Kennedy's "deliberateness" test or the plurality's more general test- applies in the "sequential interrogation" context. Under both Justice Kennedy's and the plurality's tests, the Defendant's statements must be suppressed.

### 3. Defendant's Statements Must Be Suppressed Under

---

[7] "The admission of McConer's [the defendant] unwarned statements . . . did not violate *Miranda* because these statements were not obtained through interrogation. . . Even assuming Hughes's [the police officer] bedroom questioning did constitute interrogation, however, the kitchen interrogation was still proper under *Miranda* because the circumstances surrounding McConer's conversations with Officer Hughes do not resemble those that the Supreme Court found problematic in *Seibert*." *United States v. McConer*, 530 F.3d 484, 495-96 (6th Cir. 2008) (citations omitted).

## Justice Kennedy's Test in *Seibert v. Missouri*

Justice Kennedy's test consists of two steps. First, courts must determine whether the police *deliberately* failed to deliver *Miranda* warnings during the initial interrogation. If the police acted deliberately, then the statements made by the defendant after he receives *Miranda* warnings must also be suppressed. As Justice Kennedy wrote, "[t]he admissibility of postwarning statements should continue to be governed by *Elstad* unless the *deliberate* two-step strategy was employed." *Seibert*, 542 U.S. at 620 (Kennedy, J., concurring) (emphasis added). However, if the police did not act deliberately in failing to deliver *Miranda* warnings during the initial interrogation, then courts must apply the "voluntariness" test established in *Elstad*. Justice Kennedy's test has been explained as the following:

> Justice Kennedy thus provided a fifth vote to depart from *Elstad*, but only where the police set out deliberately to withhold *Miranda* warnings until after a confession has been secured. Where the initial violation of *Miranda* was not part of a deliberate strategy to undermine the warnings, *Elstad* appears to have survived *Seibert*.

*United States v. Stewart*, 388 F.3d 1079, 1090 (7th Cir. 2004). Justice Kennedy found that the two-step interrogation technique in *Seibert* deliberately "withheld [*Miranda* warnings] to obscure both the practical and legal significance of the admonition when finally given." *Seibert*, 542 U.S. at 620 (Kennedy, J., concurring). It is the deliberateness of the police action that drove Justice Kennedy's opinion.[8] Thus, the first issue is to determine whether

---

[8] "This tactic [the two-step interrogation technique at issue in *Seibert*] relies on an *intentional misrepresentation* of the protection that *Miranda* offers and does not serve any legitimate objective that might otherwise justify its use." *Seibert*, 542 at 620-21 (Kennedy, J., concurring) (emphasis added).

the police in this case acted deliberately in failing to administer *Miranda* warnings during the initial interrogation on September 25, 2007.

Neither the Supreme Court or the Sixth Circuit have decided who carries the burden of proving that the police acted (or did not act) deliberately in failing to provide *Miranda* warnings during the initial interrogation. Other courts have held that in the "sequential interrogation" context, it is the government's burden to prove that the police did not deliberately withhold *Miranda* warnings. *United States v. Stewart*, 536 F.3d 714, 719 (7th Cir. 2008). The Seventh Circuit's reasoning logically flows from prior decisions by the Supreme Court which held that the government has the burden of demonstrating the admissibility of a confession. *Brown v. Illinois*, 422 U.S. 590, 503-04 (1975); *Seibert*, 542 U.S. at 608 n.1 (2004) (plurality opinion) (the government must prove by a preponderance of the evidence that the defendant's confession was made voluntarily). Similarly, the question of whether the police "deliberately used a two-step interrogation method designed to circumvent *Miranda* is a factual inquiry that bears upon the admissibility of the defendant's confession." *Stewart*, 536 F.3d at 719.

The court finds that when a defendant's confession was obtained during a "sequential interrogation" with *Miranda* warnings delivered midstream, it is the government's burden to prove by a preponderance of the evidence that the police did not deliberately withhold *Miranda* warnings during the initial interrogation. Shifting the burden to the prosecution has been upheld by other courts. *See United States v. Ollie*, 442 F.3d 1135, 1142-43 (8th Cir. 2006)(finding that the government must prove lack of deliberateness by a preponderance of the evidence because "[p]lacing that burden on the

-28-

prosecution is consistent with prior Supreme Court decisions that require the government to prove the admissibility of a confession before it may come into evidence"); *United States v. Stewart*, 536 F.3d 714, 719 (7th Cir. 2008).

In determining whether police deliberately withheld *Miranda* warnings, courts do not focus on the subjective intent of police officers. In *Seibert*, the plurality recognized that officers may not be candid in their reasons for failing to give *Miranda* warnings: "Because the intent of the officer will rarely be as candidly admitted as it was here (even as it is likely to determine the conduct of the interrogation), the focus is on facts apart from intent that show the question-first tactic at work." *Seibert*, 542 U.S. at 616, n. 6 (plurality opinion).

Thus, in the wake of *Seibert*, courts have applied objective factors to determine whether police deliberately withheld *Miranda* warnings. These factors include: (1) whether the police department had an official policy directing officers to use a two-step interrogation technique (*United States v. Stewart*, 536 F.3d at 718 (7th Cir. 2008)); (2) whether coercive or improper police tactics were used, including acting with aggression or hostility towards the defendant *(United States v. Nunez-Sanchez*, 478 F.3d 663, 669 (5th Cir. 2007)); (3) change in setting; (4) the lapse of time between pre-and-postwarned questioning; and (5) the overlap in content between questioning. Ultimately, the question turns on the credibility of the officer's testimony in light of the totality of the circumstances surrounding the interrogation.

In *Seibert*, Justice Kennedy suggested some plausible reasons [9] why an officer might legitimately withhold *Miranda* warnings. However, in this case Lt. Henderson has failed to provide any explanation. The court cannot make a credibility determination regarding Lt. Henderson's reasons for failing to provide *Miranda* warnings because he has failed to provide *any* explanation. Thus, the court is left to apply the objective factors to determine whether Lt. Henderson or other officers acted deliberately in failing to administer *Miranda* warnings to the Defendant.

As for the first factor, there is no evidence that Lt. Henderson or other officers were following an official police policy in withholding *Miranda* warnings. This is different than the two-step interrogation technique in *Seibert* that was mandated by the police department. *Seibert*, 542 U.S. at 609 (plurality opinion). This factor weighs in favor of admitting the postwarned statements made by Defendant on September 25, 2007.

As for the second factor, the court finds that officers did not use coercive or improper police tactics. Defendant claims that his son was handcuffed for five to ten minutes following the entry of his home. However, even if that occurred, Agent Calcagno did not begin interviewing the Defendant until approximately thirty minutes later. Thus, Defendant's son would have been un-handcuffed by the time Defendant was being

---

[9] In *Seibert*, Justice Kennedy suggested that an officer's confusion over whether the suspect is in "custody" might serve as a legitimate reason for failing to provide *Miranda* warnings: "An officer may not realize that a suspect is in custody and warnings are required." *Seibert*, 542 U.S. at 620 (Kennedy, J., concurring). *See also United States v. Stewart*, 536 F.3d 714, 721 (7th Cir. 2008) (holding that the officer's belief that the defendant was not in custody was a reasonable justification for failing to give *Miranda* warnings).

-30-

interrogated by Agent Calcagno. Ms. Smith's testimony also indicates that her handcuffs had been removed before Defendant received *Miranda* warnings from Agent Calcagno. The court has already determined that Defendant's statements to Lt. Henderson during the first forty minutes were made "voluntarily." Agent Calcagno's behavior was comparable to Lt. Henderson's, which the court has already recognized as not being coercive.

Defendant claims that during the interrogation with Agent Calcagno, he was taken to Lt. Henderson in the kitchen. Defendant claims that Lt. Henderson threatened to arrest him. Defendant does not claim that his girlfriend or children were threatened by Lt. Henderson. According to Defendant's testimony, he then went back downstairs to the basement where Agent Calcagno administered *Miranda* warnings. In response, Lt. Henderson testified that he never threatened Defendant. Due to the conflicting testimony regarding this issue, the court is forced to make a credibility determination. For the same reasons that the court previously adopted Lt. Henderson's testimony regarding this issue, the court finds that Lt. Henderson did not threaten Defendant during Agent Calcagno's interrogation. This factor weighs in favor of admitting the postwarned statements made by Defendant on September 25, 2007.

The third and fourth factors- a change (or lack thereof) in time and setting- weigh in favor of suppressing the postwarned statements made by Defendant on September 25, 2007. In determining that this case was more like *Seibert* than *Elstad*, the court recognized that there was not a sufficient break in time or setting between Lt.

Henderson's questioning and Agent Calcagno's.[10]  Lt. Henderson testified that he asked

Defendant questions during the first thirty or forty minutes following the entry of Defendant's

home.  Defendant did not remain in one room during the questioning by Lt. Henderson;

Defendant was moved around the house.  Approximately forty minutes after the initial entry,

Defendant was taken to Agent Calcagno in the basement.  Moving Defendant to the

basement was only a minor change in setting.  As the court has already explained, this is

much different than the interrogations in *Elstad*, which occurred at two separate locations.

470 U.S. at 316.  In *Elstad*, the first interrogation was at the defendant's home, whereas

the second interrogation was at the station house.  In contrast, Defendant in the current

case was moved to a different room in his home- this is not a "new and distinct" change as

in *Elstad*.

      In addition, not much time elapsed between Lt. Henderson's and Agent

Calcagno's interrogations.  In *Seibert*, the Supreme Court emphasized that a twenty minute

break between the pre-and-postwarned questioning did not remove the taint from failing

to provide *Miranda* warnings during the initial interrogation.  Here, it is possible that there

was even less time between the two interrogations.  The proximity in time and setting

between the interrogations weighs in favor of suppressing the postwarned statements

made by Defendant on September 25, 2007.

      Most courts agree that one factor is most important in determining whether

---

[10]  The court recognizes that much of the analysis in determining whether the case is
guided by *Elstad* or *Seibert* involves the same analysis in determining whether the statements
should be *suppressed* under *Seibert*.  The court applies the same factors, which includes the
overlap in time, setting, and content between the pre-and-postwarned interrogations.

police deliberately withheld *Miranda* warnings: the overlap of content between the pre-and-postwarned questioning. This emphasis on the overlap in content stems from Justice Kennedy's concurring opinion in *Seibert*:

> If the deliberate two-step strategy has been used, postwarning statements that are *related to the substance* of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made.

*Seibert*, 542 U.S. at 622 (Kennedy, J., concurring) (emphasis added). In *Seibert*, Justice Kennedy recognized the direct overlap in pre-and-postwarned questioning:

> Further, the interrogating officer here relied on the defendant's prewarning statement to obtain the postwarning statement used against her at trial. The postwarning interview resembled a cross-examination. The officer confronted the defendant with her inadmissible prewarning statements and pushed her to acknowledge them. . . Reference to the prewarning statement was an implicit suggestion that the mere repetition of the earlier statement was not independently incriminating. The implicit suggestion was false.

*Seibert*, 542 U.S. at 621 (Kennedy, J., concurring).

Other courts have emphasized the overlap in content as an important factor. In *United States v. Stewart*, the Seventh Circuit held that the statements made by the defendant during the second interrogation did not have to be suppressed. 536 F.3d at 722. The court based most of its analysis on the lack of overlap in content between the interrogations: ". . . the lack of overlap between the warned and unwarned statements is evidence that the interrogator did not deliberately use a two-step strategy designed to circumvent *Miranda*." *Id.* at 722. In *United States v. Carter*, the Second Circuit emphasized the lack of overlap in content, in holding that the defendant's statements made

-33-

during the second interrogation did not have to be suppressed: "there was almost no overlap between this statement and the full confession he gave after he received the warnings. 489 F.3d 528, 536 (2d Cir. 2007).

The interrogations in *Stewart* and *Carter* are much different than the two-step technique in *Seibert*. In *Seibert*, the second round of interrogation was "essentially a cross-examination using information gained during the first round of interrogation . . . " *Carter*, 489 F.3d at 536. In *Seibert*, a full confession was made by the defendant during the first interrogation. *Seibert*, 542 U.S. at 605 (plurality opinion). The information obtained during the initial interrogation was then used for questioning during the second interrogation. *Id.* In *Seibert*, there was no question that the information directly overlapped. *Id.* In *Carter*, the defendant made one incriminating statement, not a full confession as in *Seibert*. *Carter*, 489 F.3d at 536. In addition, in *Carter* there was no overlap between the incriminating statement made during the unwarned interrogation and the confession given later. *Id.* Furthermore, the officer conducting the second interrogation in *Carter* was not aware of the defendant's prior inculpatory statement. *Id.* Thus, the officer conducting the second interrogation in *Carter* did not use the defendant's statements from the prior unwarned interrogation. *Id.* Thus, there was not the same danger of overlap as in *Seibert*.

The court has already stated that the questioning by Lt. Henderson and Agent Calcagno were "parts of a continuum, in which it would be unnatural to repeat at the second stage what had been said before." *Seibert,* 542 U.S. at 617 (plurality opinion). Agent Calcagno asked questions about the same content -the location of the drugs- that Lt. Henderson previously asked. It is reasonable to believe that Agent Calcagno's questions

-34-

were based upon information Defendant had earlier provided to Lt. Henderson. By the time Defendant was brought to the basement, Defendant had already informed officers that the drugs were located in his garage. Thus, Defendant's unwarned statements concerning the location of the drugs were most likely used by Agent Calcagno when he interrogated Defendant in the basement. This is in sharp contrast to *Stewart* and *Carter*, where the second interrogations were not based upon the defendant's prior unwarned statements. It is clear from the facts that there was a direct overlap in content between the questions asked by Lt. Henderson and Agent Calcagno. Accordingly, this factor weighs heavily in favor of suppressing the postwarned statements made by Defendant on September 25, 2007.

In determining whether the postwarned statements on September 25, 2007 should be suppressed, the court focused on Agent Calcagno's interrogation in the basement- not the trip to Chukar Road- because that was the next interrogation following Lt. Henderson's questioning. The trip to Chukar Road occurred after Agent Calcagno had interrogated Defendant in the basement. The court notes that the trip to Chukar Road is a break in setting and time from the previous interrogations (which occurred at Defendant's home), but the court finds the overlap in content between the questioning at Defendant's home and Chukar Road as a basis for suppressing the statements made by Defendant at Chukar Road. Defendant directed officers to the house on Chukar Road because that is where he previously had acquired drugs. Officers only learned about this after Defendant admitted - prior to receiving *Miranda* warnings- that he possessed drugs in his home. The questions regarding the house on Chukar Road were directly related to Defendant's

unwarned statements. As the court previously noted, the most important factor in determining whether postwarned statements should be suppressed is the overlap in content between the pre-and-postwarned statements. Although Chukar Road presents a change in setting and time, the overlap in content weighs in favor of suppressing statements made by Defendant at Chukar Road.

While the factors suggest that Defendant's postwarned statements on September 25, 2007 should be suppressed, that is not the end of the court's analysis. In his concurring opinion in *Seibert*, Justice Kennedy noted that even if police deliberately withheld *Miranda* warnings during the initial interrogation, that would not taint later statements if the police took "curative measures before the postwarning statement is made." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring). Justice Kennedy suggested that a "substantial break in time and circumstances" between the two statements "may suffice" as adequate curative measures "in most circumstances." *Id.* However, in this case, there was only a minimal break in time between Lt. Henderson's and Agent Calcagno's interrogations. Justice Kennedy also suggested that an "additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient." *Id.* However, Agent Calcagno never told Defendant that his previous unwarned statements would be inadmissible.

Because the government has failed to prove by a preponderance of the evidence that the police did not deliberately withhold *Miranda* warnings during the initial interrogation, and because no curative measures were taken prior to Defendant's postwarned statements, the court finds that all statements made by Defendant after

-36-

receiving *Miranda* warnings on September 25, 2007, must be suppressed.  For example, this includes statements made by Defendant in the basement to Agent Calcagno, statements made in other rooms of his house, and statements made on the trip to Chukar Road.

**4.    Defendant's Statements Must Be Suppressed Under the Plurality's Test in *Seibert v. Missouri***

In *Seibert,* five justices agreed to suppress both the pre- and-postwarned statements.  542 U.S. 600 (2004).  However, only a plurality of justices agreed on the reasoning.  The plurality focused on whether the *Miranda* warnings delivered during the middle of the interrogation could "function *effectively* as *Miranda* requires."  *Id.* at 612 (plurality opinion) (emphasis added).  The plurality explained the "effectiveness" test:

> The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires.  Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture?  Could they reasonably convey that he could choose to stop talking even if he had talked earlier?  For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda* . . .

*Id.* at 612 (plurality opinion).  This "effectiveness" analysis- different than the voluntariness test of *Oregon v. Elstad*- does not emphasize whether there was police coercion in determining whether a postwarned statement should be suppressed.   Rather, the "effectiveness" analysis focuses on the following factors:(1) the completeness and detail

of the questions in the first round of interrogation; (2) overlap in content between the interrogations; (3) timing and setting of the first and second interrogations; (4) continuity of police personnel; and (5) the degree to which the interrogator's questions treated the second round as continuous with the first. *Id.* at 615 (plurality opinion).  Under the plurality's test, If the postwarned questions are sufficiently close in time and content to the prewarned questioning, then they should not be treated as independent interrogations, and consequently the postwarned statements must be suppressed like the prewarned statements.

The plurality's test in *Seibert* differs from Justice Kennedy's test in one important aspect: once you determine that the case is guided by *Seibert*, you apply the factors regardless of whether the failure to administer *Miranda* warnings during the initial interrogation was intentional or unintentional.  Justice Kennedy uses the same factors as the plurality's approach, but he uses them for a different objective: Justice Kennedy uses the factors to determine whether police officers deliberately withheld *Miranda* warnings. Justice Kennedy is only concerned about intentional failures to administer *Miranda* warnings.  Under Justice Kennedy's approach, if the failure to administer *Miranda* warnings was unintentional (such as the good faith, but mistaken belief that the suspect was not in "custody"), then the court should revert back to applying *Elstad*.  However, under the plurality's test, the factors are used to determine whether the *Miranda* warnings delivered after the initial interrogation were "effective."  Under the plurality's test, courts are not required to determine whether the officers *deliberately* withheld *Miranda* warnings.

Because the plurality's test uses the same factors as Justice Kennedy's test,

and because the court has already determined that the statements made by Defendant after receiving *Miranda* warnings should be suppressed under Justice Kennedy's narrow test, the court also finds that the statements should be suppressed under the more general test adopted by the *Seibert* plurality. The same analysis regarding overlap in content, time, and setting applies in finding that the *Miranda* warnings administered by Agent Calcagno were not "effective." In *Elstad*, the questioning at the station house was a different experience from the short conversation at the defendant's home. *Id.* In contrast, the questioning by Lt. Henderson in the basement was not a "new and distinct expedience." *Id.* Thus, the *Miranda* warnings delivered by Agent Calcagno did not present a "genuine choice whether to follow up on the earlier admission." *Id.*

Accordingly, all statements made by Defendant on September 25, 2007- both before Defendant received *Miranda* warnings, and afterwards- must be **SUPPRESSED**.[11]

III.     **STATEMENTS MADE DURING THE FIVE MEETINGS FOLLOWING THE SEARCH ON SEPTEMBER 25, 2007**

A.     **Defendant's Motion to Suppress Statements [Doc. 35]**

In his Motion to Suppress Statements [Doc. 35], Defendant moves to suppress all statements made to officers and agents during or after the search on

---

[11]  Because the court has suppressed Defendant's statements made on September 25, 2007, after Defendant received ineffective *Miranda* warnings from Agent Calcagno, the court does not have to determine whether these statements were made in violation of the Due Process Clause of the Fifth Amendment. In Defendant's Motion to Suppress Statements [Doc. 35], Defendant moves to suppress the statements he made after receiving *Miranda* warnings on two grounds: (1) the failure to administer *Miranda* warnings during Lt. Henderson's interrogation tainted Defendant's later postwarned statements; and (2) Defendant's postwarned statements were made involuntarily in violation of the Due Process clause of the Fifth Amendment.

September 25, 2007. This involves statements made by Defendant during five meetings[12] with law enforcement officers after September 25, 2007. The first meeting occurred one week after the search on September 25, 2007, at the FBI office in Knoxville. Defendant was questioned in an interview room.

The other meetings occurred over the following months, with the last meeting in April 2008. At least one of the meetings was at Defendant's home, and the other meetings were at the FBI office or police department in Knoxville. Lt. Henderson believes the home visit was in April 2008. [Doc. 55 at 9]. Agent Calcagno testified that he accompanied Lt. Henderson on this visit. Agent Calcagno visited Defendant's home because he was difficult to contact. Defendant testified that during this time he was working at a restaurant downtown, so the meetings were scheduled nearby. The FBI office and Knoxville police department are located in downtown Knoxville. Defendant did not receive *Miranda* warnings during these meetings.

Defendant moves to suppress the statements made during these meetings on two grounds. [Doc. 35]. First, Defendant argues that his statements should be suppressed because he did not receive *Miranda* warnings prior to making the statements. Second, Defendant argues that the statements should be suppressed because they were not made voluntarily, in violation of the Due Process Clause of the Fifth Amendment. [Doc. 46 at 6-10]. The court will address the *Miranda* argument first.

## 1. *Miranda* Analysis: Because Defendant Was Not in

---

[12] Agent Calcagno's 302 forms indicate five meetings took place after September 25, 2007.

**"Custody" During the Five Meetings Following September 25, 2007, Officers Were Not Required to Administer *Miranda* Warnings**

Both parties agree that Defendant did not receive *Miranda* warnings during the meetings that followed the search on September 25, 2007. However, *Miranda* safeguards are not automatically triggered when a suspect is questioned; rather, the suspect must be subject to "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436. Two elements must be satisfied: the defendant must be in "custody" and "interrogated." *Id.* The obligation to administer a *Miranda* warning to a suspect only arises "where there has been such a restriction on a person's freedom as to render him 'in custody'." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam).

Following the search on September 25, 2007, Defendant met with Agent Calcagno and Lt. Henderson at the FBI office and police department in Knoxville. Defendant was also questioned at his home on at least one occasion. Agent Calcagno testified that the goal of meeting with Defendant was to obtain additional information regarding Defendant's drug activity. [Doc 55 at 44.]. To the extent that officers asked questions concerning Defendant's drug activity, the court finds that Defendant was "interrogated." Questions concerning Defendant's drug activity constitute an "interrogation" because they are "likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

The real issue concerning these meetings is whether Defendant was in "custody." To determine if a person is in "custody," the "only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer*

-41-

*v. McCarty*, 468 U.S. 420, 442 (1984). This hinges upon whether "given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The "ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Knox*, 839 F.2d 285, 291 (6th Cir. 1988) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (internal quotation marks omitted)).

During the hearings, there was conflicting testimony regarding the custodial nature of these meetings. Defendant alleges that Lt. Henderson and Agent Calcagno threatened to arrest him if he did not meet them [Doc. 35 at 9-10]. Defendant claims that Agent Calcagno called him on a daily basis, and that he felt he had no choice but to meet him. [Doc. 55 at 21]. Defendant alleges that Lt. Henderson visited his home whenever he did not return Agent Calcagno's phone call. *Id.* Defendant claims that Lt. Henderson made at least four visits to his home. *Id.* Defendant testified that during at least at one of the meetings, Defendant was taken from his home in handcuffs and transported to the Knoxville police department. [Doc. 35 at 9-10]. Defendant claims that Agent Calcagno did not come to his house on this occasion. [Doc. 55 at 21]. Defendant testified that he was forcibly taken to the FBI office in Knoxville on another occasion. *Id.* at 22. Ms. Smith testified that officers forcibly removed Defendant from his home on multiple occasions. *Id* at 17. Ms. Smith alleges that Defendant was handcuffed during these incidents. *Id* at 18.

In response, Lt. Henderson and Agent Calcagno testified that Defendant was never handcuffed. [Doc. 55 at 45]. Agent Calcagno testified that he did not threaten

-42-

Defendant during the meetings or on the phone. *Id.* Defendant admits that his family was not threatened during any of the meetings following the search on September 25, 2007. *Id.* at 22.

Because the meeting occurred at two distinct locations- Defendant's home and various law enforcement offices- the court will analyze them separately. The court will first address the meetings at the FBI office and police department in Knoxville.

### a. Defendant Was Not in Custody During the Meetings at the FBI Office or Police Department in Knoxville

No written records were kept of the five meetings that followed the search on September 25, 2007. Due to the conflicting testimony regarding these meetings, Magistrate Judge Shirley was forced to make a credibility determination. Judge Shirley found Lt. Henderson and Agent Calcagno - due to their experience as law enforcement officers, and Defendant's criminal record- more credible:

> The Defendant has a prior felony record, and where his or Ms. Smith's testimony contradicts the testimony of Lt. Henderson and Agent Calcagno, two experienced law enforcement officers, the Court finds the officers' testimony to be more credible than the Defendant's or Ms. Smith's testimony. Lt. Henderson and Agent Calcagno freely admitted errors that were made in the investigation of this case and did not attempt to veil or skirt around either the mistakes in the search warrant or the failure to administer *Miranda* warnings earlier.

[Doc. 55 at 46]. The court agrees that Lt. Henderson and Agent Calcagno are more credible. Accordingly, the court adopts their testimony regarding the five meetings when it conflicts with Defendant's.

Defendant claims that he was handcuffed during these meetings, and that he

-43-

was forcibly removed from his house on at least two occasions. Judge Shirley recognized that being handcuffed or forcibly removed contradicts Defendant's voluntary agreement with Lt. Henderson and Agent Calcagno: "Furthermore, the entire 'arrangement' with the Defendant was based on his voluntary cooperation and the claim that handcuffs were employed does not logically follow." [Doc. 55 at 46]. Why would Defendant be handcuffed during meetings that were predicated upon his voluntary consent? It does not make sense for police officers to handcuff someone who voluntarily agreed to meet them. As further proof, consider the fact that Defendant arranged his own transportation for the first meeting (which occurred at the FBI office one week after the search on September 25, 2007). The voluntariness of Defendant's actions- to retrieve his own transportation- indicates the voluntary nature of the meetings. It defies logic - and the officers' testimony- to conclude that Defendant was handcuffed or forcibly removed during the meetings.

Assuming that Defendant was not handcuffed or forcibly removed during the meetings, the court still needs to determine whether other factors transformed it into a "custodial" setting. Several factors guide this inquiry: (1) the length and manner of questioning; (2) whether the individual possessed unrestrained freedom of movement during the interview; and (3) whether the individual was told he need not answer the questions. *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003).

As for the first factor, it is unclear how long the meetings were. The meetings were not recorded and neither party is certain as to their length. Thus, this factor is not relevant in determining whether Defendant was in custody.

As for the second factor, the weight of the evidence shows that Defendant

-44-

"possessed unrestrained freedom of movement during the interview." *Id.* The court already found that Defendant was not handcuffed during the meetings. The court also found that Defendant was not forcibly removed from his home. These facts make it less likely that a reasonable person in Defendant's position would feel restrained in leaving.

The fact that some of the meetings occurred at an FBI office or police station does not "without more, suggest that *Miranda* warnings were required. *Biros v. Bagley*, 422 F.3d 379, 390 (6th Cir. 2005). Any coercion resulting from the settings of these meetings was mitigated by Defendant's voluntary actions. The facts surrounding the first meeting show that Defendant was free to leave the meetings at any time. During the first meeting, Defendant arranged for his own transportation. Defendant walked into the Knoxville FBI office of his own free will. Defendant was not handcuffed during the meeting, nor was he arrested at its conclusion. The fact that Defendant received a phone call from Agent Calcagno does not make Defendant's actions any less voluntary. A recent Sixth Circuit decision is instructive.

In *Biros v. Bagley*, the Sixth Circuit held that a defendant was not in custody due to the voluntariness of the defendant's actions. 422 F.3d 379 (6th Cir. 2005). In *Biros*, a police officer called the defendant's home and left a message requesting that he come to the police station for questioning. *Id.* at 383. The defendant then drove to the police station and met with officers in an interrogation room. *Id.* The defendant was told that he was not under arrest and that he was free to leave at any time. *Id.* The defendant did not receive *Miranda* warnings. *Id.* The defendant then made inculpatory statements. *Id.*

Despite the interview taking place at a police station, the court found that the

defendant was not in custody.  *Id.* at 390.  "The location of the interview in the police station or that Biros was a suspect does not, without more, suggest that *Miranda* warnings were required."  *Id.*  Again, the Sixth Court emphasized the defendant's voluntariness in meeting with police officers:

> Biros traveled voluntarily to the station for the interview. Additionally, Biros remained unrestrained throughout the interview.  The police did not place him under arrest or otherwise indicate that he was not free to leave.

*Biros*, 422 F.3d at 390.

Like the defendant in *Biros*, the Defendant in the current case voluntarily agreed to meet with officers.  The fact that Agent Calcagno called the Defendant to arrange the meetings does not render Defendant's actions involuntary.  *Biros* makes it clear that a defendant's decision to meet with officers is not made involuntary simply because it was done in response to a phone call.  *Id.*  In addition, like the defendant in *Biros*, Defendant in the current case was not handcuffed during the meetings.  Accordingly, the court finds that this factor weighs in favor of admitting the statements made by Defendant during the meetings at the FBI office and police department in Knoxville.

As for the third factor, it is reasonable to assume that Defendant understood that he would not be arrested at the end of each meeting.  It is unclear whether Defendant was ever told during the meetings that he would not be arrested.  However, even assuming that Defendant was not expressly told, the pattern of the meetings- and most importantly, their outcome- suggest that Defendant came to understand that he would not be arrested at the conclusion of any of the meetings.  Defendant was not arrested during the first meeting, and it is safe to assume that Defendant came to understand that with each

-46-

subsequent meeting he would not be arrested at their conclusion. In fact, Defendant was not arrested until months after the last meeting. Judge Shirley explained the significance of Defendant not being arrested at the end of any of the meetings: "This [first] meeting set a tone for the meetings thereafter. The Defendant knew that the officers had interviewed him and released him, and thus, his fear that the subsequent meetings might lead to arrest should have subsided." [Doc. 55 at 46].

In *United States v. Mathiason*, the Supreme Court held that the defendant was not in custody because he was told that he was not under arrest. 429 U.S. 492, 495-96 (1977). In addition, the defendant in *Mathiason* was allowed to leave at the conclusion of the interview without being arrested. *Id.* The court recognizes that *Mathiason* is different in that the defendant in *Mathiason* was expressly told by the police that he was not under arrest during the interview. However, like the defendant in *Mathiason*, Defendant in the present case was allowed to leave each interview without being arrested. It is reasonable to believe that Defendant came to understand that he would not be arrested at the end of each meeting.

The court also finds that officers did not make threats which would transform the meetings into a custodial setting. Defendant admitted that officers did not threaten his family during the meetings. [Doc. 55 at 47]. There is also evidence that officers did not threaten Defendant. Ms. Smith testified that when officers visited Defendant's home for meetings, she was told that Defendant was not under arrest. *Id.* Accordingly, the court finds that this factor weighs in favor of admitting the statements made by Defendant during the meetings at the FBI office and police department in Knoxville.

For the foregoing reasons, the court finds that Defendant was not in custody during the meetings at the FBI office or the police department in Knoxville. The obligation to administer *Miranda* warnings to a suspect only arises "where there has been such a restriction on a person's freedom as to render him 'in custody'." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). Accordingly, because Defendant was not in custody during these meetings, the statements made at the FBI office and police department in Knoxville are not barred by *Miranda*.

### b.    Defendant Was Not in Custody During Meetings at His Home

The Sixth Circuit recognizes the location of questioning as an important factor in determining whether a defendant is in custody. In fact, the Sixth Circuit has held that there is a significant difference between questioning that occurs at a defendant's home, and questioning that occurs at a police station. *United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998). In *United States v. Salvo*, the Sixth Circuit held that "when police question a suspect in a residence," the encounter "often" will "not rise to the kind of custodial situation that necessitates *Miranda* warnings." *Id*. The Sixth Circuit has repeatedly recognized this, writing in a recent case that "an in-home encounter between the police and a citizen generally will be non-custodial." *United States v. Panak*, 552 F.3d 462, 466 (6th Cir. 2009). As the Sixth Circuit explains, a person has more control over a situation in his home than in a police station. This makes it much easier to terminate an interview with police officers in a home:

> If a home is a castle . . . it presumably is the one place where

individuals will feel most unrestrained in deciding whether to permit strangers into the house, in moving about once the police are there, in speaking as little or as much as they want, In curbing the scope of the interview or in simply asking the officers to leave. . . generally [persons] will find it easier to exercise control on their home turf than at the station house.

*Id*. at 465-66.  The Supreme Court recognized this difference in *Miranda*, writing that a suspect is "more keenly aware of his rights and more reluctant to tell of his indiscretions of criminal behavior within the walls of his home."  *Miranda*, 384 U.S. at 449-50.

While the fact that the meetings occurred at Defendant's home is an important consideration in determining whether Defendant was in custody, that is not the end of the court's analysis.  The Supreme Court has recognized that even when an interrogation takes place at a home, "it may become custodial without the officer having to place handcuffs on the individual."  *Panak,* 552 F.3d at 466 (citing *Orozco v. Texas*, 394 U.S. 324, 325-26 (1969)).  "The number of officers, the show of authority, the conspicuous display of drawn weapons, the nature of the questioning all may transform one's castle into an interrogation cell- turning an inherently comfortable and familiar environment into one that a reasonable person would perceive as unduly hostile and freedom-restraining."  *Panak*, 552 F.3d at 466.  However, in this case there is no evidence that officers brandished weapons or threatened Defendant during the meetings.  In fact, Ms. Smith testified that during one of the meetings at Defendant's home she was told by police that Defendant was not under arrest.  The court has already found that Defendant was not handcuffed during the meetings, and was not forcibly removed.

The facts of this case are similar to *United States v. Panak*, where the Sixth

Circuit held that the defendant was not in custody while she was questioned by police officers in her home. 552 F.3d 462. In *Panak*, the defendant was not handcuffed or physically restrained during the interview. *Id.* at 467. The defendant was never told that she could not leave. *Id.* Officers did not raise their voice, and they did not brandish firearms or handcuffs. *Id.* Furthermore, the defendant in *Panak* was not threatened with arrest: ". . . the investigators never threatened Panak with arrest, never told her that she was in trouble, never told her that she was a suspect and never told her that she was potentially subject to criminal penalties." *Id.*

Like the defendant in *Panak*, the Defendant in the current case was not handcuffed. In addition, there is no evidence that officers raised their voice or brandished firearms. The court also finds that officers did not threaten to arrest Defendant. Ms. Smith testified that during one of the meetings at Defendant's home, she was told by officers that Defendant was not under arrest. Furthermore, it defies logic that Defendant was handcuffed or threatened during meetings that were predicated upon his voluntary consent.

The fact that Defendant could have been arrested for failing to cooperate does not mean that he was under arrest during the meetings. It is true that Defendant received phone calls from Agent Calcagno, but this pressure is not enough to transform the interviews into a custodial setting. Certainly, there was some pressure to cooperate- drugs had been found at Defendant's home- but that is not enough to find that Defendant was in custody. The central inquiry in determining whether Defendant was in custody is whether a reasonable person in his position would feel free to terminate the interview. *Thompson*

-50-

*v. Keohane*, 516 U.S. 99, 112 (1995). The court finds that Defendant was not in custody because the meetings occurred at Defendant's home (a setting that the Sixth Circuit has recognized as substantially less coercive than a police station), Defendant was not threatened with arrest during the meetings, Defendant was not arrested following the meetings, Defendant was not handcuffed during the meetings, and officers did not yell at Defendant or brandish weapons during the meetings. These factors outweigh the pressure that Defendant felt to cooperate.

Accordingly, because Defendant was not in custody during these meetings, the statements made at his home are not barred by *Miranda*.


2.      **Defendant's Statements at the Five Meetings Following the Search on September 25, 2007 Were Made Voluntarily Under Both *Elstad v. Oregon* and Traditional Due Process Analysis**

Defendant argues that his statements made during the five meetings following the search on September 25, 2007, were tainted by law enforcement's failure to administer effective *Miranda* warnings during the interrogations on September 25, 2007. [Doc. 46 at 6]. In response, the government argues that Defendant made his statements during the five meetings voluntarily, and thus these statements were not tainted by the ineffective *Miranda* warnings on September 25, 2007.

Defendant moves to suppress his statements on two grounds. First, Defendant argues that his statements should be suppressed under the "fruit of the poisonous tree" doctrine. Second, Defendant argues that his statements were made

-51-

involuntarily, in violation of the Due Process Clause of the Fifth Amendment. The court will address Defendant's "fruit of the poisonous tree" argument first.

> **a.    The "Fruit of the Poisonous Tree" Doctrine Does Not Apply Because There Was No Constitutional Violation On September 25, 2007**

Defendant argues that his statements made during the five meetings should be suppressed as "fruit of the poisonous tree":

> The statements extracted from Flack on September 25, 2007, were involuntary - the product of inherently coercive police tactics on that day. Therefore, all statements made by Flack subsequent to September 25, 2007, are the fruits of those illegally obtained statements and should be excluded from the Government's case in chief.

[Doc. 46 at 6]. Defendant's reliance upon the "fruit of the poisonous tree" doctrine is misplaced. The "fruit of the poisonous tree" doctrine does not apply because Defendant's statements during the interrogations on September 25, 2007, were made voluntarily[13]. Thus, because Defendant's statements were made voluntarily on September 25, 2007, they were not obtained unlawfully.

The "fruit of the poisonous tree" doctrine only applies if there has been a constitutional violation, and the Supreme Court has recognized that the mere failure to administer *Miranda* warnings - so long as the defendant's statements were made voluntarily- does not give rise to a constitutional violation. *Patane*, 542 U.S. at 639. "[The] mere failure to give *Miranda* warnings does not, by itself, violate a suspect's constitutional rights or even the *Miranda* rule." *Id.* Accordingly, the "fruit of the poisonous tree" doctrine

---

[13] *See supra* Part I.B.1.

does not apply.

### b. Defendant's Statements at the Five Meetings Were Made Voluntarily Under *Elstad v. Oregon*

During the search on September 25, 2007, Defendant was first interrogated by Lt. Henderson. Defendant did not receive *Miranda* warnings at this time. Approximately forty minutes after the entry into Defendant's home, Defendant was taken to the basement and interviewed by Agent Calcagno. Defendant received *Miranda* warnings from Agent Calcagno, but the court found them "ineffective" due to their closeness in time, setting, and content with Lt. Henderson's interrogation. Following the search on September 25, 2007, Defendant met with Lt. Henderson and Agent Calcagno on five occasions. The first meeting was a week after the search on September 25, 2007. Four other meetings were held over the following months, with the last meeting in April 2008. Defendant met with officers at his home on at least one occasion. The other meetings took place at the FBI office and police department in Knoxville.

The issue is whether the failure to provide effective *Miranda* warnings on September 25, 2007, tainted Defendant's statements made during the later meetings. In other words, the court must determine whether Defendant's statements at the later meetings were voluntary. The court will address this issue in two different ways. Under both *Elstad v. Oregon*[14], and the Due Process Clause of the Fifth Amendment, Defendant's

---

[14] The circumstances surrounding the meetings are more like *Elstad v. Oregon* than *Seibert v. Missouri*. The meetings were distinct enough in time and setting from the interrogations on September 25, 2007, to be a "new and distinct" experience. *Seibert*, 452 U.S. at 615-16 (plurality opinion). The meetings were not like the "sequential interrogations" by Lt. Henderson and Agent Calcagno on September 25, 2007, which were part of the same continuum due to their proximity in time and setting.

statements at the meetings were made voluntarily.

The court recognizes that the facts of this case do not perfectly match those of *Elstad*. In *Elstad*, the *Miranda* warnings administered during the second interrogation were effective. In the present case, the court found that the *Miranda* warnings administered by Agent Calcagno on September 25, 2007, were not effective. *Elstad* applies when a defendant does not receive *Miranda* warnings during the initial interrogation, and then receives effective *Miranda* warnings prior to the second interrogation. *See Elstad*, 470 U.S. at 314 (holding that the "subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement"). It is arguable that the administration of ineffective *Miranda* warnings is akin to no *Miranda* warnings being delivered at all.

However, deciding whether *Elstad* applies does not affect the court's analysis, because *Elstad*'s test mirrors traditional Due Process analysis. Both tests look to the "totality of the circumstances" in assessing whether a defendant's will was overborne. *Id.* at 318. The purpose is to determine whether police activity was so coercive that it made

---

In *Elstad*, the questioning at the station house was distinct enough in time and setting to remove the taint from failing to administer *Miranda* warnings during the questioning at the defendant's house: " . . . since a reasonable person in the suspect's shoes could have seen the station house questioning as a *new and distinct experience*, the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission." *Id.* (plurality opinion) (emphasis added). In the present case, the change in time and setting - Defendant was interrogated at the FBI office and police department in Knoxville with at least a week apart from the interrogations on September 25, 2007- makes this case more like *Elstad* than *Seibert*.

Defendant's statements involuntary. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). When a defendant claims that a confession was coerced, the Government bears the burden of proving by a preponderance of the evidence that the confession was made voluntarily. *United States v. Johnson*, 351 F.3d 254, 261 (6th Cir. 2003).

The only difference between *Elstad* and traditional Due Process analysis is that *Elstad* emphasizes two factors as being especially important. Under *Elstad*, courts pay careful attention to whether there was a substantial break in time or setting between the interrogations. These factors- as applied to the current case- suggest that Defendant's statements made during the five meetings following the search on September 25, 2007, were made voluntarily.

In *Elstad v. Oregon*, the Supreme Court emphasized the change in time and setting as important factors in holding that the failure to administer *Miranda* warnings during the initial interrogation did not taint subsequent confessions by the defendant. 470 U.S. 298. In *Elstad*, the first interrogation occurred at the defendant's home. *Id.* The defendant did not receive *Miranda* warnings at this time. *Id.* The second interrogation was at a station house a day later. *Id.* During the station house interrogation, the defendant made inculpatory statements. *Id.* The defendant argued that his statements at the station house should be suppressed because they were tainted by the officers' failure to administer *Miranda* warnings during the interrogation at the defendant's home. *Id.* The Supreme Court rejected the defendant's argument, holding that his statements made at the station house were not tainted by the officers' prior failure to administer *Miranda* warnings. *Id.*

In *Elstad*, the Supreme Court held that the defendant's statements during the

first interrogation, although unwarned, were made voluntarily.  *Id*.  In addition, the Supreme

Court held that the defendant's statements made during the second interrogation- after the

defendant received *Miranda* warnings- were made voluntarily.  *Id*.  The Supreme Court then

established the rule that "a suspect who has once responded to unwarned yet uncoerced

questioning is not thereby disabled from waiving his rights and confessing after he has

been given the requisite *Miranda* warnings."  *Id*. at 318.  Under *Elstad*, as long as both the

prewarned statements (those made during the initial interrogation during which the

defendant did not receive *Miranda* warnings) and postwarned statements (those made

during the subsequent interrogation during which the defendant received *Miranda*

warnings) were made voluntarily, then the postwarned statements are admissible.

The court has already found that Defendant's statements during the

interrogations on September 25, 2007, were made voluntarily.  Thus, the court must

determine whether his statements made during the five meetings following the

interrogations on September 25, 2007, were made voluntarily.  As the Supreme Court

made clear in *Elstad*, "the admissibility of any subsequent statement should turn in these

circumstances *solely on whether it is knowingly and voluntarily made. Id*. at 309 (emphasis

added).

It is true that the same officers who interrogated Defendant on September 25,

2007, interrogated Defendant at the later meetings.  It is true that Defendant did not receive

fresh *Miranda* warnings prior to any of the later meetings.  It is also true that the questions

asked at the later meetings overlapped with the questions asked on September 25, 2007.

However, as the Supreme Court made clear in *Elstad*, a substantial break in time and

setting between interrogations can remove the taint from the failure to administer effective *Miranda* warnings during the initial interrogation. 470 U.S. at 318.

Like the interrogations in *Elstad*, there was a substantial break in time and setting between the interrogations on September 25, 2007, and the five meetings that followed. The first meeting was a week after the search on September 25, 2007. In *Elstad*, the interrogations occurred a day apart, and the Supreme Court found that there was a substantial break in time. *Id.* Because the meetings in the present case occurred a week apart from the interrogations on September 25, 2007, the court finds that this was a substantial break in time. In addition, there was a significant change in setting in the present case. The interrogations that occurred on September 25, 2007, were at Defendant's home. While it is true that some of the later meetings occurred at Defendant's home, the first meeting took place at the FBI office in Knoxville. This is a substantial change in setting between the interrogations. In *Elstad*, the Supreme Court found there was a substantial change in setting when the initial interrogation was at the defendant's home, and the subsequent interrogation was at a police station. *Id.* Like *Elstad*, the interrogations in the present case occurred in substantially different settings.

Due to the substantial break in time and setting between the interrogations that occurred on September 25, 2007, and the meetings that followed, the court finds that Defendant made his statements at the later meetings voluntarily.

        **c.**    **Defendant's Statements at the Five Meetings Were Made Voluntarily Under the Due Process Clause of the Fifth Amendment**

Having analyzed the facts under *Elstad*, the court now undertakes a

traditional Due Process analysis. This requires the court to determine "whether a defendant's will was overborne in a particular case." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (quoting *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994)). For a statement to be considered the product of coercion, three requirements must be met: (1) the police activity was objectively coercive; (2) the coercion in question was sufficient to overbear the defendant's will; and (3) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement. *Mahan*, 190 F.3d at 422. None of the factors were present during the meetings that followed the search on September 25, 2007.

First, police activity was not objectively coercive during these meetings. Defendant was not handcuffed, nor was he threatened with arrest. Ms. Smith testified that during a meeting that occurred at Defendant's home, officers told her that Defendant was not under arrest. Officers did not yell at Defendant during the meetings, nor did they brandish weapons or handcuffs. In addition, Defendant admits that officers did not threaten his family during the meetings.

The fact that Defendant could have been arrested for failing to cooperate does not mean that he acted involuntarily in deciding to meet officers. It is true that Defendant received phone calls from Agent Calcagno, but this pressure is not enough to render his statements involuntary. As the court previously explained, the Sixth Circuit decision, *Biros v. Bagley*, makes it clear that a defendant's decision to meet with officers is not made involuntary simply because it was done in response to a phone call. 422 F.3d at 390. Like the defendant in *Biros*, the Defendant in the current case voluntarily agreed

to meet with officers.  The voluntariness of these meetings was made clear from the beginning, when Defendant arranged his own transportation for the first.  Accordingly, the court finds that Defendant's statements made during the five meetings following the search on September 25, 2007, were made voluntarily.

In summary, admitting the statements made by Defendant during the five meetings following the search on September 25, 2007, does not violate *Miranda*, *Elstad*, or the Due Process Clause of the Fifth Amendment.  Accordingly, the statements made by Defendant during these meetings will **NOT BE SUPPRESSED**.


IV.      **PHYSICAL EVIDENCE OBTAINED DURING THE SEARCH ON SEPTEMBER 25, 2007, AND ANY SUBSEQUENT MEETING INVOLVING DEFENDANT**

A.      **Defendant's Motion to Suppress Physical Evidence [Doc. 33]**

In his Motion to Suppress Physical Evidence [Doc. 33], Defendant moves to suppress all physical evidence obtained as a consequence of the search on September 25, 2007.  Defendant argues that the warrant in this case was issued without probable cause in violation of the Fourth Amendment of the United States Constitution.  *Id.*  In addition, Defendant argues that the warrant lacked probable cause because Judge Lebowitz was not a neutral and detached magistrate.  *Id.*  Defendant argues that the search on September 25, 2007 was illegal, and therefore any physical evidence derived as a consequence of that search should be suppressed.

In response, the government argues that the search warrant was supported by probable cause, that Judge Lebowtiz served as a neutral and detached magistrate, and

alternatively, that the "good faith" exception would apply. *See United States v. Leon*, 468 U.S. 897 (1984).

Having reviewed the record, the court is in full agreement with Magistrate Judge Shirley's determination that the warrant in this case was supported by probable cause. *See* Doc. 55 at 48-55. Judge Shirley's analysis of this issue was thorough and correct:

> Viewing the contents of the affidavit and omitting the untrue statements identified above, the Court finds that the affidavit contains reliable information established through two controlled buys that employed surveillance by numerous officers, recording, the use of identified cash, and controlled conditions. This information, taken from within the four corners of the affidavit, establishes a fair probability that contraband or evidence of a crime' would be found . . .

[Doc. 55 at 51-2] [citations omitted].

Defendant does not raise new arguments in his Objection to the R&R [Doc. 59]. Rather, Defendant repeats the arguments he raised in his Motion to Suppress Physical Evidence [Doc. 33]. Because Defendant's Objection to the R&R [Doc. 59] raises the same arguments that were previously addressed by Judge Shirley, the court rejects them for the same reasons.

Accordingly, the court finds that the search warrant in this case was supported by probable cause. Because the search warrant did not violate the Fourth Amendment, there was no constitutional violation on September 25, 2007. Because there was no constitutional violation during the search on September 25, 2007, the "fruit of the poisonous tree" doctrine does not apply. Accordingly, Defendant's Motion to Suppress Physical Evidence [Doc. 33] is **DENIED** in its entirety.

-60-

For the foregoing reasons, Judge Shirley's R&R [Doc. 55] is **ACCEPTED IN PART AND DENIED IN PART**.  Defendant's Objections to the R&R [Doc. 59] are **OVERRULED**, whereby Defendant's Motion to Suppress Physical Evidence [Doc. 33] is **DENIED** in its entirety.  Defendant's Motion to Suppress Statements [Doc. 35] is **DENIED IN PART AND GRANTED IN PART**.  Accordingly, the court **ORDERS** the following:

- **All statements made by Defendant prior to receiving *Miranda* warnings on September 25, 2007, are suppressed.**

- **The cocaine and any other physical fruit derived from Defendant's statements made prior to receiving *Miranda* warnings on September 25, 2007, are not suppressed.**

- **All statements made by Defendant after receiving *Miranda* warnings on September 25, 2007, are suppressed.**

- **The statements made by Defendant during the five meetings following the search on September 25, 2007, are not suppressed.**

**ENTER:**

_____s/ Thomas W. Phillips_____
United States District Judge